Barry I. Levy, Esq.
Michael Sirignano, Esq.
Alexandra Wolff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO                                    Docket No.:_____ (     )
CASUALTY COMPANY,

                              Plaintiffs,

                 -against-                                             **Plaintiff Demands a Trial**
                                                                       **by Jury**

EMERTH LANCE COBURN, M.D., ELMHURST MEDICAL
CARE OF QUEENS, P.C., VALERIA LOUKANOVA IVANOV,
M.D., VLI MEDICAL, P.C., SHERIF NASEF, P.T., KINETIC
APPROACH PHYSICAL THERAPY P.C. EDUARD RUBINOV,
PITKIN EXPRESS CARE PHARMACY INC, OLGA
PINKHASOV, and JOHN DOE DEFENDANTS "1" through
"10",

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Emerth Lance Coburn, M.D.,

("Coburn") Elmhurst Medical Care of Queens, P.C. ("Elmhurst Medical"), Valeria Loukanova

Ivanov, M.D. ("Ivanov"), VLI Medical, P.C. ("VLI Medical"), Sherif Nasef, P.T. ("Nasef"),

Kinetic Approach Physical Therapy P.C. ("Kinetic Approach"), Eduard Rubinov ("Rubinov"),

Pitkin Express Care Pharmacy Inc ("Pitkin Pharmacy"), Olga Pinkhasov ("Pinkhasov"), and John

Doe Defendants "1" through "10" ("John Doe Defendants")(collectively, the "Defendants"),

hereby allege as follows:

## NATURE OF THE ACTION

1.      GEICO brings this action to terminate a fraudulent scheme perpetrated by the

Defendants who exploited the New York "No-Fault" insurance system by billing GEICO more

than $3.6 million in charges relating to medically unnecessary, illusory, and otherwise

unreimbursable healthcare and pharmaceutical services that were rendered, to the extent rendered

at all, in a predetermined, protocol fashion at a purported medical clinic located at 82-25 Queens

Boulevard, Elmhurst, New York (the "Clinic"), which has been illegally owned and controlled by

unlicensed laypersons in violation of law.

2.      The Defendants' scheme included submitting thousands of fraudulent charges for

excessive and unnecessary healthcare services allegedly rendered to individuals involved in

automobile accidents and eligible for coverage under policies of automobile insurance issued by

GEICO ("Insureds").  The healthcare services, or purported services, include extracorporeal

shockwave therapy ("ESWT"), electromyography ("EMG") studies, nerve conduction velocity

("NCV") testing, outcome assessment testing, and physical therapy (collectively, "Fraudulent

Services"), as well as pharmaceuticals dispensed pursuant to purported prescriptions by

practitioners at the Clinic primarily for lidocaine 5% ointment, esomeprazole magnesium delayed

release capsules, and naproxen sodium tablets (collectively, "Fraudulent Pharmaceuticals").

3.      To effectuate the scheme, the unlicensed laypersons "purchased" the licenses of

healthcare professionals in order to fraudulently incorporate, own and/or control various healthcare

professional practices, and cause those healthcare professional practices to operate at the Clinic. The unlicensed laypersons then used their control of the professional practices to target the Fraudulent Services and Fraudulent Pharmaceuticals based on their high profit margins and illegally derive economic benefit from these healthcare services. In fact, GEICO has received billing from a "revolving door" of more than seventy separately named healthcare providers purportedly operating at the Clinic, including from: (i) Elmhurst Medical, nominally owned by Coburn; (ii) a sole proprietorship using the name and license of Coburn ("CoburnSP"); (iii) VLI Medical, nominally owned by Ivanov; (iv) a sole proprietorship using the name and license of Ivanov ("IvanovSP"); and (v) Kinetic Approach, nominally owned by Nasef (collectively, the "Provider Defendants"), as well as from Pitkin Pharmacy, the pharmacy associated with the Clinic and its predetermined treatment protocols.

4.      Through this action, GEICO seeks recovery of more than $1.2 million that has been stolen by Defendants, along with a declaration that it is not legally obligated to pay reimbursement of more than $1.9 million in pending No-Fault insurance claims that have been submitted by or on behalf of the Provider Defendants and Pitkin Pharmacy, because:

(i)      the Provider Defendants were fraudulently incorporated and/or unlawfully owned, controlled, and operated by unlicensed laypersons;

(ii)     the Provider Defendants and Pitkin Pharmacy submitted claims for Fraudulent Services and Fraudulent Pharmaceuticals, respectively, that were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    the Provider Defendants submitted claims for Fraudulent Services using billing codes that misrepresented and exaggerated the nature and level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

3

    (iv)    the Provider Defendants and Pitkin Pharmacy engaged in illegal kickback, referral and fee-splitting arrangements with unlicensed individuals and entities as part of a scheme to defraud New York automobile insurers; and

    (v)    in many cases, the Fraudulent Services were provided – to the extent they were provided at all – by independent contractors rather than by the Provider Defendants or their employees.

5.    The Defendants fall into the following categories:

    (i)    The Provider Defendants are medical, chiropractic, and physical therapy professional corporations through which the Fraudulent Services purportedly were performed and billed to automobile insurance companies, including GEICO;

    (ii)    Coburn, Ivanov, and Nasef (collectively, the "Nominal Owner Defendants") are all licensed healthcare professionals who falsely purport to own and control the Provider Defendants;

    (iii)    Pitkin Pharmacy and its owner Rubinov (collectively, the "Pharmacy Defendants") billed GEICO for the Fraudulent Pharmaceuticals after engaging in unlawful kickback relationships to steer medically unnecessary prescriptions generated at the Clinic to Pitkin Pharmacy;

    (iv)    Pinkhasov and John Doe Defendants "1" – "10" (collectively, the "Management Defendants") are persons and entities who are not licensed healthcare professionals but who secretly and unlawfully own, control, and/or derive economic benefit from the Provider Defendants and Pitkin Pharmacy in contravention of New York law. Through their illegal ownership and/or control of the Provider Defendants, the Management Defendants engaged in collusive referral and fee-splitting arrangements and caused Insureds to be referred by and amongst the Provider Defendants and Pitkin Pharmacy for the sole purpose of exploiting the Insureds' no-fault benefits.

6.    As discussed below, the Defendants at all relevant times have known that: (i) the Provider Defendants were fraudulently incorporated and/or unlawfully owned and controlled by unlicensed laypersons; (ii) the Fraudulent Services and Fraudulent Pharmaceuticals were not medically necessary and were provided – to the extent provided at all- pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) the billing codes

Defendants used for purposes of billing the Fraudulent Services misrepresented and exaggerated the nature and level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iv) the Provider Defendants and Pitkin Pharmacy engaged in illegal kickbacks, referral arrangements and/or unlawfully split fees with unlicensed individuals and entities, including the Management Defendants, as part of a scheme to defraud New York automobile insurers; and (v) in many instances, the Fraudulent Services were provided – to the extent they were provided at all – by independent contractors, rather than by employees of the Provider Defendants.

7.     As such, the Defendants do not have any right to be compensated for the Fraudulent Services and Fraudulent Pharmaceuticals that have been billed to GEICO through the Provider Defendants and Pitkin Pharmacy.

8.     The charts annexed hereto as Exhibits "1" through "6" set forth the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted to GEICO.

9.     The Defendants' fraudulent scheme began as early as 2019 and continues uninterrupted through the present day. As a result of the Defendants' scheme, GEICO has incurred damages of more than $1.2 million.

## THE PARTIES

### I.     Plaintiffs

10.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company, are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

11.     Defendant Coburn resides in and is a citizen of New York. Coburn is a physician licensed to practice medicine in New York who agreed to allow for the formation of CoburnSP and Elmhurst Medical (collectively, the "Coburn Providers") and to "front" as the owner while allowing the Management Defendants to use his license and the Coburn Providers as billing "vehicles" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

12.     Coburn was previously sued for his involvement in a No-Fault insurance fraud scheme where it was alleged that he allowed laypersons to use his medical license and control a medical professional corporation he claimed to own on paper and on billing submissions for fraudulent testing billed to Nationwide.  Nationwide Affinity Ins. Co. of America et al. v. Clinton Medical Office, P.C. et al., Index No. 607304/2021 (Sup. Ct. Nassau Cty. 2021).

13.     Elmhurst Medical is a fraudulently owned New York medical professional corporation, incorporated on September 13, 2021, operating from the Clinic with Coburn as the nominal owner. The Defendants used Elmhurst Medical to submit billing for the Fraudulent Services to automobile insurance companies, including GEICO.

14.     Defendant Ivanov resides in and is a citizen of New York. Ivanov is a physician licensed to practice medicine in New York who agreed to allow for the formation of IvanovSP and VLI Medical (collectively, the "Ivanov Providers") and to "front" as the owner while allowing the Management Defendants to use her license and the Ivanov Providers as billing "vehicles" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

15.     VLI Medical is a fraudulently owned New York medical professional corporation, incorporated on January 3, 2023, operating from the Clinic with Ivanov as the nominal owner.  The

Defendants used VLI Medical to submit billing for the Fraudulent Services to automobile insurance companies, including GEICO.

16.     Defendant Nasef resides in and is a citizen of New York. Nasef is a licensed physical therapist in New York who agreed to allow for the formation of Kinetic Approach, and to "front" as the owner while allowing the Management Defendants to use his license and Kinetic Approach as a billing "vehicle" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

17.     A physical therapy corporation Nasef previously owned was identified as part of a recent federal indictment, discussed in more detail below, involving numerous individuals who paid kickbacks to hospitals and medical providers in exchange for patient information and referrals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(S.D.N.Y. 2019).

18.     Kinetic Approach is a fraudulently owned New York physical therapy professional corporation, incorporated on August 14, 2019, operating from the Clinic with Nasef as the nominal owner. The Defendants used Kinetic Approach to submit billing for the Fraudulent Services to automobile insurance companies, including GEICO.

19.     Defendant Rubinov resides in and is a citizen of New York. Rubinov is the record owner of Pitkin Pharmacy and is not a licensed pharmacist. Rubinov engaged in collusive agreements with the Management Defendants pursuant to which he paid kickbacks or other financial incentives to the Management Defendants in exchange for large volumes of prescriptions from the Clinic being steered to Pitkin Pharmacy.

20.     Pitkin Pharmacy is a New York corporation incorporated on or about July 16, 2014 and is owned by Rubinov. Pitkin Pharmacy registered with the New York State Education

Department Office of Professions ("NYSOP") on April 13, 2017. The Defendants used Pitkin Pharmacy as part of their fraudulent scheme to bill automobile insurance companies, like GEICO, for the Fraudulent Pharmaceuticals.

21.     Pinkhasov resides in and is a citizen of New York.  Pinkhasov is a non-physician who at all times has conspired and participated in the fraudulent scheme outlined in this Complaint, including: (i) illegally owning and controlling the Clinic and the Provider Defendants with others, including the Management Defendants named herein and John Doe Defendants; (ii) engaging in illegal referral and kickback arrangements and fee splitting; and (iii) establishing and implementing predetermined fraudulent treatment and billing protocols to support the excessive rendering and billing of the medically unnecessary Fraudulent Services and Fraudulent Pharmaceuticals.

22.     John Doe Defendants "1" through "10" are citizens of New York whose names are not yet known to GEICO who conspired to and did participate in the fraudulent and unlawful scheme alleged in this Complaint, including illegally owning, controlling, and deriving economic benefit from the operation of the Clinic and the Provider Defendants in contravention of New York law, engaging in illegal referral and fee splitting arrangements with the Provider Defendants and Pitkin Pharmacy, and dictating and directing the fraudulent, predetermined treatment and billing protocols at the Clinic.

**JURISDICTION AND VENUE**

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

24.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

26.     GEICO underwrites automobile insurance in New York.

**I.      An Overview of Pertinent Law Governing No-Fault Reimbursement**

27.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

9

28.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

29.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

30.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

31.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….  (Emphasis added).

32.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

33.     Unlicensed non-physicians may <u>not</u>: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

34.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  <u>See, e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

35.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. <u>See, e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

36.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

37.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

38.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or

his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

39.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

40.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

41.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

42.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information

concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    **Defendants' Fraudulent Scheme**

43.    Beginning in 2019, the Defendants conceived and implemented a complex fraudulent scheme in which the Provider Defendants -- owned on paper by the Nominal Owner Defendants, but actually illegally owned and controlled by the Management Defendants -- were used to bill GEICO and the New York automobile insurance industry for millions of dollars for No-Fault insurance benefits they were never entitled to receive.

44.    To effectuate the scheme, the Management Defendants controlled the Clinic, along with its patient base, and then colluded with the Nominal Owner Defendants to form various healthcare practices using the licensed healthcare professionals as sham owners of those practices. The Management Defendants then implemented fraudulent, predetermined, billing and treatment protocols designed solely to maximize profits without regard to genuine patient care, while also controlling the billing, collections, and ultimately all revenues realized by the Provider Defendants at the Clinic.

45.    The Defendants' fraudulent scheme included: (i) "purchasing" the licenses of the Nominal Owner Defendants; (ii) using those licenses to illegally incorporate, own, and/or control the Provider Defendants; (iii) engaging in illegal referral, kickback, and/or fee splitting arrangements, including with Pitkin Pharmacy; (iv) dictating and implementing fraudulent billing and treatment protocols; (v) subjecting automobile accident victims to those fraudulent protocols; and (vi) using the Provider Defendants as vehicles to submit fraudulent No-Fault billing to GEICO and other New York automobile insurers.

46.    The Nominal Owner Defendants did not establish their own practices at the Clinic, but rather "walked" into the Clinic with its own pre-existing patient base, which was generated and controlled by the Management Defendants.

47.    The Nominal Owners Defendants did not advertise or market their association with the Clinic to the general public.

48.    The Provider Defendants did not advertise or market their services at the Clinic to the general public.

49.    The Nominal Owner Defendants did nothing to attract patients or create a patient base for their alleged professional "practices" at the Clinic.

50.    The Management Defendants, rather than the Nominal Owner Defendants, created and controlled the Clinic, the Provider Defendants, and the patient base at the Clinic, while concealing themselves as, among other things, a purported billing company and office manager, in order to avoid detection of the illegal scheme by insurers, regulators, and law enforcement.

51.    The Management Defendants gained control of the Clinic through Kinetic Approach, which purports to be the primary leaseholder of the Clinic.

52.    Through the Management Defendants' control of Kinetic Approach, and using its name on the master lease at the Clinic, the Management Defendants furthered their control of the Clinic, and the Provider Defendants operating there, by: (i) determining which providers would be given access to the Clinic's patients; (ii) dictating which services would be offered to patients; (iii) implementing predetermined treatment protocols at the Clinic; and (iv) establishing the kickback and illegal fee splitting arraignments that would be required of medical providers interested in either operating from the Clinic or accessing the Clinic's patient base.

53.     As discussed in more detail below, the Management Defendants further ensured the success of their scheme by placing Pinkhasov as the Clinic's office manager to make sure the predetermined protocols and kickback and fee splitting arrangements were being followed.

54.     To further ensure their scheme's success, and control the flow of monies, the Management Defendants also made sure each of the Provider Defendants used the same billing company, Margelan Inc. ("Margelan"), which is owned by Pinkhasov's husband, Ilya Pinkhasov.

55.     By controlling the Clinic's primary lease, patient base, front desk, treatment protocols, and the Provider Defendants' billing and collections, among other things, the Management Defendants exercised all material decision-making authority relating to the operation and management of the Clinic and the Provider Defendants, including all treatments and services rendered to Insureds.

56.     In an attempt to maximize the Defendants' fraudulent billing and their profits, patients, upon entering the Clinic, were subjected to sham examinations by the Coburn Providers or Ivanov Providers at the direction of the Management Defendants, as a result of the phony diagnoses and recommendations listed in the examination reports, and were then systematically directed to undergo a course of unnecessary and excessive treatment – including physical therapy, ESWT, outcome assessment testing, EMG and NCV testing – with the various modality healthcare providers operating from the Clinic including the Provider Defendants.

57.     The Defendants also arranged for the prescriptions to Insureds of excessive and unnecessary pharmaceuticals using providers at the Clinic, usually the Provider Defendants, to issue the prescriptions, which were then steered by the Management Defendants to Pitkin Pharmacy in exchange for kickback payments.  These prescriptions were issued, to the extent

issued at all, to allow the Management Defendants to realize additional revenue from the payment of kickbacks.

58.     The Clinic, though ostensibly organized to provide a range of health care services to Insureds at a single location, has, at all times, been under the control of the Management Defendants, who organized and created the Clinic to be a convenient, one-stop shop for No-Fault insurance fraud.

59.     In keeping with the fact that the Clinic has been under the control of the Management Defendants, and not the licensed healthcare professionals, GEICO has received billing submitted under the names of more than seventy-six (76) different healthcare providers that have operated from the Clinic during various time periods, purportedly rendering and billing for a high volume of medically unnecessary healthcare services.  These healthcare providers have included, but are not limited to, multiple medical practices, chiropractic practices, acupuncture practices, physical therapy practices, pain management practices, diagnostic testing practices and psychology practices.

60.     Notwithstanding the frequent change of professional corporations and healthcare providers at the Clinic, there was never any genuine "sale," "transfer," or "dissolution" of a healthcare practice or professional corporation by any legitimate professional owner working at the Clinic.

61.     Notwithstanding the frequent change of professional corporations and healthcare providers at the Clinic, there was never any genuine change in the nature and/or frequency of the Fraudulent Services allegedly rendered or the type and nature of the billings submitted to GEICO from the Clinic.  In other words, while the names of the healthcare providers may have changed, the fraudulent scheme remained the same due to the Management Defendants' overall control.

**A.      The Fraudulent Ownership and Operation of the Provider Defendants**

62.     The Nominal Owner Defendants were all recruited at one time or another by the Management Defendants to serve as sham owners of the Provider Defendants.

63.     The Provider Defendants were fraudulently owned, controlled, and used to operate at the Clinic, or created to replace other healthcare professional practices operating from the Clinic from time to time, including some of the other Provider Defendants – in an effort to evade detection by GEICO and allow Defendants to continue their fraudulent conduct.

64.     The Nominal Owner Defendants falsely represented that they were the true shareholders, directors, officers, and owners of the Provider Defendants, and that they truly owned, controlled, and practiced through the professional corporations and professional practices, knowing that the Provider Defendants would be used to submit fraudulent billing to insurers.

65.     Although the Nominal Owner Defendants' names and licenses were used to form and operate the Provider Defendants, the Nominal Owner Defendants exercised no genuine ownership or control over the Provider Defendants or the profits that were generated from them.

66.     The Nominal Owner Defendants have never been the true shareholders, directors, officers, owners, or controllers of the Provider Defendants, and never had any true ownership interest in or control over their respective professional corporations and practices.

67.     True ownership and control over the Provider Defendants has always rested entirely with the Management Defendants, who used the facade of the Provider Defendants to do indirectly what they are forbidden from doing directly, namely: (i) employ medical professionals; (ii) control those medical professionals' practices; and (iii) charge for and derive an economic benefit from their services.

68.     The Nominal Owner Defendants and the Provider Defendants relied on the Management Defendants for access to patients.

69.     For example, the Provider Defendants merely appeared at the Clinic and immediately began treating, or purported to treat, patients under the direction and control of the Management Defendants. The Management Defendants ensured that patients would be cultivated and waiting at the Clinic to be "treated" under the names of Provider Defendants, without any effort by the Nominal Owner Defendants and regardless of any need for genuine patient care.

70.     The Clinic served as a "revolving door" for various putative healthcare practices, which the Management Defendants opened and closed periodically in an effort to avoid detection of the fraudulent scheme.  Accordingly, when one of the Provider Defendants ceased its operations at the Clinic, the Management Defendants simply replaced that provider with a new provider of the same type, which would then proceed to seamlessly "treat" the Clinic's existing patients under the direction and control of the Management Defendants.

71.     The Nominal Owner Defendants had no genuine doctor-patient relationship with the Insureds that visited the Clinic, as the patients were simply directed by the Management Defendants to subject themselves to treatment by whatever healthcare providers were present that day at the Clinic, regardless of the actual healthcare needs of the patients themselves.

72.     Once Insureds arrived at the Clinic for treatment, the Management Defendants dictated the scope of the medical and other professional services that each patient received from the Provider Defendants, regardless of the actual medical needs of the individual Insureds.

73.     Throughout the course of the Nominal Owner Defendants' relationships with the Management Defendants, all decision-making authority relating to the operation and management of the Provider Defendants was vested entirely with the Management Defendants.

74.     The Management Defendants' decision-making authority relating to the operation and management of the Clinic and the Provider Defendants included control over the treatment protocols, including what treatment, testing, and other services the Insureds received, the scope of the referrals and prescriptions for goods and/or services the Insureds received, and which healthcare provider or professional practice would render or provide those services.

75.     The Management Defendants' decision-making authority also included control over how the Fraudulent Services were billed to insurers, including GEICO; who performed the billing services on behalf of the Clinic; and how the profits of the Provider Defendants were to be divided and dispersed.

76.     The Management Defendants mandated all of the financial arrangements with the Provider Defendants and concealed the arrangements through individual "sham" agreements with each of the Provider Defendants.

77.     The individual agreements and financial arrangements with the Provider Defendants were each not reflective of fair market value or the actual value of the services provided, if any, and when totaled among all of the Provider Defendants, reflect an egregious scheme to use each of the Provider Defendants as a vehicle to illegally profit from professional medical services, unlawfully split fees, and funnel large sums of money to themselves in contravention of New York law.

### i.     The Fraudulent Ownership and Operation of Kinetic Approach

78.     The Management Defendants started by recruiting a licensed physical therapy professional who was willing to sell the use of his professional license to the Management Defendants so that the Management Defendants could fraudulently incorporate and/or control a

physical therapy professional corporation under the physical therapy professional's name, which professional corporation the Management Defendants used to obtain a master lease at the Clinic.

79.     Beginning in the middle of 2019, the Management Defendants recruited Nasef, a licensed physical therapy professional, who was willing to sell to the Management Defendants the use of his professional license so that they could fraudulently incorporate and/or control Kinetic Approach to submit billing for the Fraudulent Services to GEICO at the Clinic.

80.     In fact, during this same time frame, a different physical therapy corporation purportedly owned by Nasef was identified as part of a recent federal indictment involving numerous individuals who allegedly paid monies to hospitals, medical providers and others for confidential patient information, and the patients would be contacted and "referred" for medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(S.D.N.Y. 2019).

81.     Government affidavits filed in support of surveillance warrants, including wiretaps, were unsealed in USA v. Rose. These affidavits detail the massive scope of the patient brokering scheme, reveal the identity of numerous layperson controllers and fraudulent clinic locations, and expressly implicate medical corporations, including Nasef's, that were used and controlled by laypersons in furtherance of the fraudulent scheme. See USA v. Rose, ECF No. 398.

82.     In order to circumvent New York law preventing non-physical therapist professionals from owning and controlling physical therapy professional corporations, the Management Defendants entered into a secret scheme with Nasef, wherein, in exchange for a designated salary or other form of compensation, Nasef agreed to falsely represent, in the certificates of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of

Kinetic Approach and that he truly owned, controlled, and practiced through the professional corporation.

83.     Under this arrangement, Nasef agreed to falsely represent that he continued to be the true shareholder, director, officer, and owner of Kinetic Approach and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

84.     In 2019, the Management Defendants – rather than Nasef – provided all costs associated with setting up Kinetic Approach at the Clinic as well as all investments in Kinetic Approach. Nasef did not incur any costs to establish Kinetic Approach's practice at the Clinic, nor did he invest any money in the professional corporation subsequent to ceding control over Kinetic Approach to the Management Defendants.

85.     As a result, Nasef was no longer the true shareholder, director, officer, or owner of Kinetic Approach and no longer had any true ownership interest in or control over the professional corporation. In fact, true ownership and control over Kinetic Approach always rested entirely with the Management Defendants, who used the facade of Kinetic Approach to do indirectly what they were forbidden from doing directly, namely: (i) employ physical therapy professionals; (ii) control their practice; and (iii) charge for and derive an economic benefit from their services.

86.     Following Nasef's decision to cede control of the professional corporation, (i) he exercised absolutely no control over or ownership interest in Kinetic Approach and (ii) all decision-making authority relating to the operation and management of Kinetic Approach was vested entirely with the Management Defendants.

87.     In addition, subsequent to the purchase of his physical therapy license by the Management Defendants, Nasef did not control or maintain any of Kinetic Approach's books or

records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Kinetic Approach's financial affairs; never hired or supervised any of Kinetic Approach's employees or independent contractors; and was unaware of fundamental aspects of how Kinetic Approach operated.

88.    In reality, Nasef was never anything more than a de facto employee of the Management Defendants.

89.    Kinetic Approach was used as a vehicle by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law.

90.    Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as Kinetic Approach was subject to the pecuniary interests of non-physical therapists as opposed to the independent medical judgment of true physical therapist-owners.

### ii.    The Purchase of Coburn and Ivanov's Licenses and Ownership of the Coburn Providers and the Ivanov Providers

91.    In 2021, the Management Defendants recruited Coburn and Ivanov to participate in the Fraudulent Scheme at the Clinic, with a focus on using their names and licenses to provide, or purport to provide, among other things, medically unnecessary extracorporeal shockwave therapy ("ESWT") treatments to patients.  Based on the arrangement, Coburn and Ivanov would receive a periodic payment in exchange for allowing their name, license, and the tax identification numbers of the Coburn Providers and the Ivanov Providers (collectively, the "ESWT Defendants") to be used and would contend that they supervised the Fraudulent Services if any insurance company ever inquired.

92.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into secret schemes with Coburn and Ivanov, wherein, in exchange for a designated salary or other form of compensation, Coburn and Ivanov agreed to falsely represent that they were the true shareholders, directors, officers, and owners of the ESWT Defendants and that they truly owned, controlled, and practiced through the professional corporations and practices that would be used to submit fraudulent billing to insurers.

93.     The Management Defendants – rather than Coburn and Ivanov – provided all costs associated with setting up the ESWT Defendants at the Clinic as well as all investments in them.  As part of this arrangement, Coburn and Ivanov did not incur any costs to establish their practices at the Clinic, nor did they invest any money in the professional corporations or practices subsequent to ceding control over the ESWT Defendants to the Management Defendants.

94.     In fact, true ownership and control over the ESWT Defendants always rested entirely with the Management Defendants, who used the facade of the ESWT Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

95.     Following Coburn and Ivanov's decision to cede control of their professional practices and corporations, (i) they exercised absolutely no control over or ownership interest in the ESWT Defendants, and (ii) all decision-making authority relating to the operation and management of the ESWT Defendants was vested entirely with the Management Defendants.

96.     In addition, subsequent to the purchase of their medical licenses by the Management Defendants, Coburn and Ivanov did not control or maintain any of the ESWT Defendants' books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals

or entities responsible for handling any aspect of the ESWT Defendants' financial affairs; never hired or supervised any of the ESWT Defendants' employees or independent contractors; and were unaware of fundamental aspects of how the ESWT Defendants operated.

97.     In keeping with the fact Coburn was not involved in the performance of the Fraudulent Services or the operation and/or management of the Coburn Providers at the Clinic, Coburn was allegedly providing non-ESWT services from another professional corporation he owns, Be Evergreen Medical P.C., at another clinic during the exact same time frame the Coburn Providers were billing for the Fraudulent Services.

98.     Similarly, despite allegedly providing services through the Ivanov Providers at the Clinic, Ivanov was also performing services for Essen Medical Associates, New York Preventative Medical Clinic, and served as an associate professor of family medicine for Mount Sinai during the same time frame the Ivanov Providers were billing for the Fraudulent Services.

99.     In order for the fraudulent scheme to work, the Defendants needed to use the ESWT Defendants sequentially as vehicles through which to submit billing for the Fraudulent Services purportedly provided at the Clinic from June 2021 through March 2024.

100.     CoburnSP, which is a fraudulently owned New York medical sole proprietorship that operated from the Clinic, was the first of the ESWT Defendants to be used and allegedly provided the Fraudulent Services for approximately four months from June 2, 2021 to October 19, 2021.

101.     On September 13, 2021, roughly five weeks before CoburnSP ceased providing the Fraudulent Services, the Management Defendants incorporated Elmhurst Medical. Despite being incorporated in mid-September, the Defendants began using Elmhurst Medical on August 5, 2021

to submit billing for the Fraudulent Services and continued billing under Elmhurst Medical for approximately fourteen (14) months until October 27, 2022.

102.     Once the Management Defendants stopped using Elmhurst Medical for the Fraudulent Services, they started using IvanovSP, which is another fraudulently owned New York medical sole proprietorship that operated from the Clinic.  The Management Defendants continued billing under IvanovSP for approximately five months from September 6, 2022 through February 1, 2023.

103.     Roughly one month before IvanovSP stopped billing, the Management Defendants incorporated VLI Medical on January 3, 2023. After billing through IvanovSP stopped, the Management Defendants started billing for the Fraudulent Services through VLI Medical from March 2, 2023 through March 2024.

104.     The Management Defendants used each of the ESWT Defendants interchangeably to submit billing for the Fraudulent Services allegedly provided from the Clinic. In fact, GEICO received billing from the ESWT Defendants, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

105.     The Management Defendants' interchangeable use of the ESWT Defendants can be seen from the frequent transition of an Insured's ESWT treatment from one ESWT Defendant to another.

106.     The following are representative examples:

(i)     CoburnSP purported to provide ESWT to an Insured named JA until October 7, 2021, when JA purportedly started receiving ESWT from Elmhurst Medical;

(ii)    Elmhurst Medical purported to provide ESWT to an Insured named JAS until September 9, 2022, when JAS purportedly started receiving ESWT from IvanovSP, and then allegedly started receiving ESWT from VLI Medical on March 7, 2023;

(iii)   IvanovSP purported to provide ESWT to an Insured named JF until March 2, 2023, when JF purportedly started receiving ESWT from VLI Medical;

(iv)    CoburnSP purported to provide ESWT to an Insured named EC until October 28, 2021, when EC purportedly started receiving ESWT from Elmhurst Medical, and then allegedly started receiving ESWT from IvanovSP on October 25, 2022;

(v)     Elmhurst Medical purported to provide ESWT to an Insured named RRG until November 7, 2022, when RRG purportedly started receiving ESWT from IvanovSP;

(vi)    Elmhurst Medical purported to provide ESWT to an Insured named EF until October 6, 2022, when EF purportedly started receiving ESWT from IvanovSP;

(vii)   CoburnSP purported to provide ESWT to an Insured named ME until October 28, 2021, when ME purportedly started receiving ESWT from Elmhurst Medical;

(viii)  Elmhurst Medical purported to provide ESWT to an Insured named ZO until September 20, 2022, when ZO purportedly started receiving ESWT from IvanovSP;

(ix)    IvanovSP purported to provide ESWT to an Insured named JR until March 7, 2023, when JR purportedly started receiving ESWT from VLI Medical; and

(x)     IvanovSP purported to provide ESWT to an Insured named EY until March 2, 2023, when EY purportedly started receiving ESWT from VLI Medical.

107.    The interchangeable use of the ESWT Defendants is further corroborated by testimony Ivanov provided during an examination under oath of IvanovSP on February 24, 2023. During the examination under oath, she testified that she inherited her "front desk manager",

Pinkhasov, from Elmhurst Medical, as well as Elmhurst Medical's billing company, Margelan, which is owned by Pinkhasov's husband.

108.    In addition to Pinkhasov and Margelan, Ivanov testified she inherited two employees from Elmhurst Medical who performed the services billed to GEICO, Venecia Mercedes Marte ("Marte") and Marina Isakova ("Isakova"). Ivanov acknowledged that she assumed these employees, as well as Pinkhasov and Margelan, were from Elmhurst Medical, despite testifying she has never met Coburn.

109.    In actuality, Ivanov did not simply start providing the Fraudulent Services on her own at the Clinic. Rather, she allowed the Management Defendants to use her name and the Ivanov Providers' tax identification numbers to continue the fraudulent scheme they had started by billing the Fraudulent Services through the Ivanov Providers after retiring the Coburn Providers.

110.    The use of the ESWT Defendants sequentially and as part of the same fraudulent scheme is also evidenced by the fact that NF-3 forms for each of the ESWT Defendants includes the same typo, listing the service provided as "shokewave." The following are some examples:

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | | FEE SCHEDULE TREATMENT CODES | TOTAL CHARGE |
|---|---|---|---|---|---|
| 9/22/22 | 82-25 Queens Blvd, 1A Elmhurst, NY 1137 | - Shoke Wave | x  1 | 0101T | $700.39 |
| | | | | TOTAL CHARGES TO DATE : | $700.39 |

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| Treating Provider's Name | Title | Licence or Certificate No. | Business Relation ( check applicable box) | | |
|---|---|---|---|---|---|
| | | | Employee | Independent Contractor | Other (specify) |
| Mercees  Marte  Venecia | P.A. | 009530-01 | X | | |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary)

| | | |
|---|---|---|
| Valeria Loukanova-Ivanov | M.D. | 257670-01 |

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | | FEE SCHEDULE TREATMENT CODES | TOTAL CHARGE |
|---|---|---|---|---|---|
| 8/30/22 | 82-25 Queens Blvd, IA Elmhurst, NY 11373 | - Shoke Wave | x  1 | 0101T | $700.39 |
| | | TOTAL CHARGES TO DATE : | | | $700.39 |

**16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:**

| Treating Provider's Name | Title | Licence or Certificate No. | Business Relation ( check applicable box) | | |
|---|---|---|---|---|---|
| | | | Employee | Independent Contractor | Other (specify) |
| Mercees Marte Venecia | P.A. | 009530-01 | X | | |

**17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).**

Emerth I. Coburn     M.D.     198832

111.    Further evidence of the Management Defendants' use of the ESWT Defendants interchangeably, as part of a common fraudulent scheme, is the fact that on several occasions, one of the ESWT Defendants submitted bills for Fraudulent Services with accompanying medical records written on forms belonging to another of the ESWT Defendants. For example, IvanovSP submitted several bills to GEICO for EMG and NCV testing allegedly performed by Isakova but submitted EMG/NCV reports written on Elmhurst Medical forms.

112.    In reality, Coburn and Ivanov were never anything more than de facto employees of the Management Defendants, who used the ESWT Defendants as vehicles through which they could unlawfully split-fees and funnel large sums of money to themselves in contravention of New York law.

113.    Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the ESWT Defendants, who were subjected to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

**B.    The Management Defendants' Efforts to Conceal Their Ownership and Control of the Provider Defendants Through Sham Financial Arrangements**

114.    The Management Defendants used each of the Provider Defendants as "vessels" so that they could illegally profit from the Fraudulent Services, unlawfully split fees, and funnel large sums of money to themselves in contravention of New York law.

115.    To conceal their illegal fee splitting, kickback, referral relationships, and true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have the Nominal Owner Defendants and the Provider Defendants enter into "management," "billing," "collection," "transportation," "lease," "marketing" agreements and/or other financial arrangements.

116.    These agreements or financial arrangements called for payments that were purportedly for the performance of certain designated services including management, marketing, billing, collections, transportation, and/or equipment leasing, etc., but were in actuality: (i) sham agreements and arrangements; (ii) not reflective of the fair market value or the actual value of the services provided; and (iii) decoys to conceal the Management Defendants' illegal ownership and control over the Provider Defendants and/or illegal kickback arrangements.

117.    In fact, the agreements and financial arrangements were created, dictated, and imposed by the Management Defendants upon the Provider Defendants to present the illusion that the Provider Defendants were paying legitimate fees for legitimate services, but they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Provider Defendants; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the Provider Defendants.

118.    The net effect of these "management," "billing," "collection," "transportation," "marketing," "lease," and/or other financial arrangements, was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations and

healthcare practices, their accounts receivable, and all revenues generated therefrom.

119.    In keeping with the fact that the Management Defendants illegally controlled the Clinic, Ivanov testified under oath to the following;

a.    She dealt with Pinkhasov about providing medical services at the Clinic, and Pinhasov contacted her and told her the Clinic had space available;

b.    Pinkhasov "worked" for Elmhurst Medical at the time;

c.    She initially said she "had interview with" Pinkasov but then claimed that she interviewed Pinkasov and decided to keep her when she started work at the Clinic;

d.    She never met Coburn or purchased his Elmhurst Medical practice, but "took over" the accountant, Midas Services Inc., office manager (Pinkhasov), billing company (Margelan), healthcare employees (Marte and Isakova), and services (EMG/NCV, outcome assessment testing, and ESWT) from Elmhurst Medical when she started operating from the Clinic;

e.    She signed a lease for space at the Clinic with Kinetic Approach, despite not knowing if Kinetic Approach had a primary lease to the Clinic;

f.    She received written protocols from the "previous practice" when she started at the Clinic;

g.    She received the written protocols from Pinkhasov;

h.    Pinkhasov handles all of the contact with the billing company (Margelan) on behalf of Ivanov;

i.    Margelan electronically signs bills submitted to GEICO on Ivanov's behalf;

j.    She does not and never has marketed the services she or her professional corporations provide at the Clinic – patients come from the physical therapy practice at the Clinic or through referrals from lawyers who used to work with the prior practice at the Clinic, but she does not know any of their names;

k.    Pinkhasov opens up the Clinic everyday;

l.    Pinkhasov handles, among other things, patient and employee scheduling, patient paperwork, and she has Ivanov's electronic prescription system log-in credentials; and

m.    She visits the Clinic at most once or twice per week.

120.    In addition to that testimony, Ivanov testified she rented the machine IvanovSP used to administer ESWT from a company called All Borough Leasing, Inc. ("All Borough").  Not coincidentally, like Margelan, All Borough is owned by Ilya Pinkhasov (Pinkhasov's husband) and both Margelan and All Borough are registered to Pinkhasov's home address.

121.    Further evidence of the Management Defendants' control over the Provider Defendants is seen by the Provider Defendants: (i) use of the same fax number and cover page to submit their bills to GEICO; (ii) use of the same contact phone number listed on their NF-3 form; (iii) the inclusion of a similar seven-digit invoice number in the top right hand corner of the NF-3 form; and (iv) the inclusion of what appears to be a similar five-digit patient or file number in the bottom left hand corner of their NF-3 form. Some examples are included below:

INVOICE NUMBER 0028636

**NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW**
**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
(This form is not verification of hospital treatment)

NAME AND ADDRESS OF INSURER:
Geico Insurance Co
P.O BOX 9507
Fredericksburg VA 22403-9504

NAME OF INSURER'S CLAIM REPRESENTATIVE:

| DATE 3/ 1/22 | POLICY HOLDER | POLICY NUMBER | DATE OF ACCIDENT 08/01/2020 | CLAIM NUMBER 0042192800101138 |

PROVIDER'S NAME AND ADDRESS:
Elmhurst Medical Care of Queens PC
P.O.Box 650097
Fresh Medows NY 11365          Tel: 718-255-1603

INVOICE NUMBER 0048952

**NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW**
**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
(This form is not verification of hospital treatment)

NAME AND ADDRESS OF INSURER:
Geico Insurance Company
P.O BOX 9507
Fredericksburg VA 22403-9504

NAME OF INSURER'S CLAIM REPRESENTATIVE:

| DATE 7/24/23 | POLICY HOLDER | POLICY NUMBER | DATE OF ACCIDENT 06/13/2023 | CLAIM NUMBER 0325013460101027 |

PROVIDER'S NAME AND ADDRESS:
Kinetic Approach Physical Therapy PC
P.O.Box 747640
Rego Park, NY 11374          Tel: 718-255-1603

INVOICE NUMBER 0044412

**NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW**
**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
(This form is not verification of hospital treatment)

| NAME AND ADDRESS OF INSURER: | NAME OF INSURER'S CLAIM REPRESENTATIVE: |
|---|---|
| GEICO General Insurance Co.<br>P.O BOX 9507<br>Fredericksburg VA 22403-9504 | |

| DATE<br>04/14/2023 | POLICY HOLDER | POLICY NUMBER | DATE OF ACCIDENT<br>01/14/2023 | CLAIM NUMBER<br>0353026720101053 |
|---|---|---|---|---|

| PROVIDER'S NAME AND ADDRESS: |
|---|
| VLI Medical PC<br>P.O.Box 747650<br>Rego Park NY 11374         Tel: 718-255-1603 |

122.     Additionally, some of the fax cover sheets sent with the Provider Defendants' bills list the names of other Provider Defendants at the top.  For example, the fax cover sheets below were sent on behalf of Kinetic Approach, as well as another professional corporation operating at the Clinic (Youssefi Diagnostic Chiropractic Care of Queens), but list IvanovSP as the provider at the top.  See, for example:

# FAX

TO:

FROM:                                           Fax Number: (856) 294-5154      # of Pages: 6
                                                                                (including cover sheet)
Name: Valeria Loukanova - Ivanov               FROM:
Fax Number: (917) 893-7785                      Name: Valeria Loukanova - Ivanov
                                               Fax Number: (917) 893-7785

Subject: Claim: 0353026720101053 Patient: ▇▇▇▇▇▇▇▇▇ der: Youssefi Diagnostic Chiropractic
Care of Queens DOS: 03/01/2023-03/01/2023

Subject: Claim: 0353026720101053 Patient: ▇▇▇▇▇▇▇ ount: $459.2 Provider: Kinetic Approach Physical Therapy
PC DOS: 01/17/2023-01/30/2023

Message:                                        Message:
Claim: 0353026720101053 Patient: ▇▇▇▇▇▇▇       Claim: 0353026720101053 Patien ▇▇▇▇▇▇ Bill: 0041971
Amount: $446.86 Provider: Youssefi Diagnostic  Amount: $459.2 Provider: Kinetic Approach Physical Therapy PC DOS:
Chiropractic Care of Queens DOS:               01/17/2023-01/30/2023
03/01/2023-03/01/2023

123.     These similarities would not be expected of supposedly separate and distinct entities controlled by separate, licensed professionals but would be expected from entities operating from the same Clinic and under the common ownership and control of the Management Defendants.

32

C. **The Management Defendants' Kickback Arrangement with Pitkin Pharmacy**

124.    In addition to profits the Management Defendants received as a result of the billing they submitted through the Provider Defendants, the Management Defendants exploited their illegal control of the patients, the healthcare services, and the Clinic by the receipt of kickbacks paid by transient healthcare providers who occasionally provided services at the Clinic, as well as Pitkin Pharmacy, in exchange for access to the Clinic's patient base.

125.    In particular, beginning in the middle of 2020, Rubinov entered into a kickback relationship with the Management Defendants pursuant to which the Management Defendants would direct the Nominal Owner Defendants and/or Provider Defendants to routinely prescribe the Fraudulent Pharmaceuticals and would steer large volumes of those prescriptions to Pitkin Pharmacy, which offered Pitkin Pharmacy the opportunity to submit charges to GEICO for these expensive prescriptions.

126.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from: (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

127.    Here, the Pharmacy Defendants colluded to have providers at the Clinic, usually Coburn, Ivanov, and/or the Coburn Providers or Ivanov Providers (collectively, the "Prescriber Defendants") prescribe, or purport to prescribe the Fraudulent Pharmaceuticals and direct those prescriptions to Pitkin Pharmacy so that they could bill GEICO huge sums without regard to actual patient care.

128.    In fact, more than 90% of Insureds for whom Pitkin Pharmacy allegedly provided the Fraudulent Pharmaceuticals were issued the prescriptions from providers at the Clinic.

129.    In furtherance of the scheme, the Prescriber Defendants and other providers at the Clinic, intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the Clinic pursuant to the collusive kickback arrangements and fraudulent predetermined protocols, and without regard to medical necessity, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

130.    Unlike legitimate pharmacies that dispense a wide variety of medications, approximately 90% of Pitkin Pharmacy's pharmaceutical billing to GEICO was for a limited set of expensive pharmaceuticals -- Lidocaine ointment and/or patches, esomeprazole magnesium delayed release pills, and naproxen sodium pills -- i.e., the Fraudulent Pharmaceuticals.

131.    Not coincidentally and as part of the Pharmacy Defendants' arrangement with the Management Defendants, the Insureds were given the Fraudulent Pharmaceuticals dispensed by Pitkin Pharmacy directly from the front desk staff at the Clinic, without ever seeing the actual prescription or, in many cases, not even knowing that they were going to receive a Fraudulent Pharmaceutical.

132.    The Management Defendants and the Prescriber Defendants did not give the Insureds the option to identify a pharmacy of their choosing, to ensure that the prescriptions were filled by Pitkin Pharmacy, and to ensure that the Pharmacy Defendants benefitted financially from the prescriptions.

133.    The Prescriber Defendants had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

134. Rubinov and Pitkin Pharmacy had no legitimate medical reason to support the steering of large quantities of prescriptions for the Fraudulent Pharmaceuticals to them that they dispensed to patients.

135. In keeping with the fraudulent scheme, the Prescriber Defendants prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the Clinic, while Pitkin Pharmacy dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Pharmaceuticals were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

136. Furthermore, the Management Defendants had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Pitkin Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

137. The Management Defendants, the Prescriber Defendants, and Pharmacy Defendants would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to Pitkin Pharmacy, unless they profited from their participation in the illegal scheme.

138.    But for the payments of kickbacks or other financial incentives from Rubinov and Pitkin Pharmacy, the Management Defendants would not have implemented a predetermined protocol pursuant to which the Prescriber Defendants prescribed large volumes of Fraudulent Pharmaceuticals, and the Management Defendants would not have directed the prescriptions to Pitkin Pharmacy.

139.    The Pharmacy Defendants affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

140.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, Pitkin Pharmacy paid a financial kickback or provided other financial incentives, and the Management Defendants received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Pitkin Pharmacy.

141.    Upon information and belief, the payment of kickbacks by Rubinov and Pitkin Pharmacy was made at or near the time the prescriptions were issued.

**D.    Defendants' Fraudulent Treatment and Billing Protocol**

142.    The Provider Defendants, in accordance with the Management Defendants' predetermined fraudulent treatment and billing protocol, subjected the Insureds to a myriad of illusory and medically unnecessary healthcare services – including boilerplate examinations, ESWT, EMGs, NCVs, outcome assessment testing, PT, among other things (i.e., the "Fraudulent Services"), as well as various pharmaceuticals (i.e., the "Fraudulent Pharmaceuticals").

143.    Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" involving the Fraudulent Services and Fraudulent Pharmaceuticals -- regardless of the severity of the accident or the nature of the Insured's injuries (or lack of any

36

injuries) -- designed to maximize the billing that Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to it.

144.    Each step in the fraudulent testing and treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing for each Insured treating at the Clinic.

145.    Patients purportedly underwent an initial examination, and as a result, each patient was diagnosed with conditions that varied little, with the examining provider consistently concluding that the same predetermined, excessive, and unnecessary treatment was medically necessary for each patient.  The examinations invariably led to voluminous physical therapy treatments, chiropractic services, outcome assessment testing, ESWT, diagnostic testing, and prescriptions for pharmaceuticals.

146.    No legitimate physician acting in the interest of providing genuine patient care would have permitted the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

     **i.**    **Fraudulent ESWT Treatments**

147.    Pursuant to the Management Defendant's fraudulent billing and treatment protocol, the ESWT Defendants, in addition to other Fraudulent Services, caused bills to be submitted to GEICO representing that the ESWT Defendants subjected Insureds to multiple sessions of medically useless "ESWT" treatments.

148.    The Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault

reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule; and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

149. In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, for the first time, established a rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) relating to emerging technology with a "BR" designation, meaning that definitive reimbursement had not previously been established.

150. Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement, the experimental nature of the service, and because – if properly performed – the service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

151. Defendants, facing changes that curbed their other abuses of New York's no-fault law, suddenly turned to ESWT. However, as discussed in more detail below, ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, the Centers for Medicare & Medicaid Services ("CMS") has published coverage guidance stating that ESWT is not reasonable and necessary for the treatment of musculoskeletal

conditions, and there is no legitimate peer reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

152.    The ESWT billed through the ESWT Defendants was not medically necessary and was provided – to the extent provided at all – pursuant to the Management Defendants' predetermined fraudulent protocols designed solely to financially enrich them, rather than to treat or otherwise benefit the Insureds.

153.    Neither Coburn, Ivanov, nor any other licensed physicians were ever involved in the performance of ESWT.  In fact, once the Management Defendants were given access to the ESWT Defendants, they arranged to have Insureds at the Clinic subjected to ESWT despite there being no clinical basis for the services and to submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

154.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a predetermined fraudulent treatment protocol, which included ESWT, without regard for the Insureds' individual symptoms or presentment.

155.    In fact, the Defendants have billed GEICO alone more than $1 million through the ESWT Defendants for the alleged performance of ESWT at the Clinic from June 2, 2021 through March 2024. Notably, more than 1,350 claim submissions were made to GEICO seeking payment of No-Fault Benefits for ESWT, all of which represented that Coburn and Ivanov were the legitimate owners of their respective professional corporations and practices. In truth, Coburn and Ivanov performed none of the ESWT and did not legitimately operate or manage the ESWT Defendants.

156.    Despite this, the Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments." In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that the ESWT Defendants were each just one of several billing entities that they used, the Management Defendants arranged to have the services documented on a generic "report" devoid of any useful information about the treatment.

157.    These reports contained one page and looked like a sign-in sheet. Each of these "reports" submitted to GEICO was virtually identical regardless which of the ESWT Defendants allegedly rendered the treatment or which Insured received it. The following is an example of a "report" submitted by each of the ESWT Defendants:

158.   Once documented by independent contractors allegedly employed by the ESWT Defendants, the Defendants billed GEICO for the performance of ESWT under the tax identification numbers associated with the ESWT Defendants using CPT code 0101T.

41

Case 1:24-cv-04922-HG   Document 1   Filed 07/16/24   Page 42 of 127 PageID #: 42

CATEGORY III CODES
**Medical Fee Schedule**

0042T–0504T

**Effective April 1, 2019**

| | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|
| ■ | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

159.    As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology.  Temporary codes may become permanent codes or deleted during updates of the code set.  Additionally, and as noted in the Fee Schedule, the CPT code: (i) is scheduled to be paid using the conversion rate for surgical services; and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

160.    The Defendants' charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating

42

that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it is not reasonable and necessary for the treatment of musculoskeletal conditions and, therefore, not covered.

161.    Notwithstanding the experimental nature of ESWT, the Defendants' charges for the medically unnecessary ESWT were also fraudulent in that the Defendants did not even actually provide high energy ESWT that satisfies the requirements of CPT code 0101T. Instead, the Defendants actually provided Radial Pressure Wave Therapy.  Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.  Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T.

162.    In allegedly providing "ESWT," the ESWT Defendants utilized a portable, compact radial wave pressure device that does not even purport to be able to provide the high energy capacity necessary to produce a true shock wave. In fact, Ivanov testified during the EUO of IvanovSP that she uses a "Chattanooga Mobile 2RW" [*sic*] (Radial Pressure Wave) device to provide the ESWT treatments, which Chattanooga describes as using "radial pressure wave technology." Accordingly, even if the ESWT was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain – which it does not – the ESWT Defendants did not even provide high energy ESWT treatments, but merely a form of pressure wave therapy that the Defendants fraudulently billed under CPT code 0101T.

163.    Despite actually providing Radial Pressure Wave Therapy, the Defendants purported to provide "ESWT" to virtually every Insured as part of a predetermined fraudulent protocol without regard to each Insured's individual complaints, symptoms, or presentation.  In furtherance of that, the ESWT was provided to Insureds soon after, sometimes only days after,

43

their accident without giving the patients the opportunity to sufficiently respond to well known, conservative therapies.

164.    For example, the ESWT Defendants typically rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

(i)     Elmhurst Medical purported to provide ESWT to an Insured named SD on December 30, 2021, only one day after the Insured's accident on December 29, 2021;

(ii)    Elmhurst Medical purported to provide ESWT to an Insured named RC on February 8, 2022, only four days after the Insured's accident on February 4, 2022;

(iii)   CoburnSP purported to provide ESWT to an Insured named JA on June 2, 2021, only three days after the Insured's accident on May 30, 2021;

(iv)    CoburnSP purported to provide ESWT to an Insured named RC on June 15, 2021, only six days after the Insured's accident on June 9, 2021;

(v)     CoburnSP purported to provide ESWT to an Insured named EC on June 15, 2021, only four days after the Insured's accident on June 11, 2021;

(vi)    IvanovSP purported to provide ESWT to an Insured named SB on September 29, 2022, only two days after the Insured's accident on September 27, 2022;

(vii)   IvanovSP purported to provide ESWT to an Insured named AC on September 13, 2022, only one day after the Insured's accident on September 12, 2022;

(viii)  IvanovSP purported to provide ESWT to an Insured named GCP on January 17, 2023, only three days after the Insured's accident on January 14, 2023;

(ix)    VLI Medical purported to provide ESWT to an Insured named KA on June 20, 2023, only eight days after the Insured's accident on June 12, 2023; and

(x)     VLI Medical purported to provide ESWT to an Insured named FC on May 11, 2023, only five days after the Insured's accident on May 6, 2023.

165.    Additionally, and as part of the predetermined fraudulent protocol, the ESWT Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the

Clinic regardless of any differences in injuries or symptomatology.   The following are representative examples:

      (i)      On May 9, 2021, four Insureds – FC, NC, NC, and RC – were involved in the same automobile accident.   Thereafter, FC, NC, NC, and RC all presented to the Clinic, and each purportedly received ESWT from VLI Medical on May 11, 2023;

      (ii)     On November 22, 2022, two Insureds – RG and DG – were involved in the same automobile accident.   Thereafter, RG and DG both presented to the Clinic, and each purportedly received ESWT from IvanovSP and VLI;

      (iii)    On December 2, 2021, two Insureds – PL and JR – were involved in the same automobile accident.   Thereafter, PL and JR both presented to the Clinic and each purportedly received ESWT from Elmhurst Medical;

      (iv)    On March 9, 2022, two Insureds – GB and LE – were involved in the same automobile accident.   Thereafter, GB and LE both presented to the Clinic. GB and LE each purportedly received ESWT from Elmhurst Medical on March 15, 2022 and IvanovSP afterwards;

      (v)     On December 5, 2021, two Insureds – FR and PS – were involved in the same automobile accident.   Thereafter, FR and PS both presented to the Clinic and each purportedly received ESWT from Elmhurst Medical on December 14, 2021;

      (vi)    On March 20, 2021, two Insureds – EES and ME– were involved in the same automobile accident.   Thereafter, EES and ME both presented to the Clinic and each purportedly received ESWT from CoburnSP on June 15, 2021;

      (vii)   On May 6, 2021, two Insureds – ED and BMP– were involved in the same automobile accident.   Thereafter, ED and BMP both presented to the Clinic, and each purportedly received ESWT from CoburnSP and Elmhurst Medical;

      (viii)  On November 21, 2022, four Insureds – JRF, DR, JR, and MR – were involved in the same automobile accident.   Thereafter, JRF, DR, JR, and MR all presented to the Clinic, and each purportedly received ESWT from IvanovSP;

      (ix)    On August 18, 2022, two Insureds AB and MR –were involved in the same automobile accident.   Thereafter, AB and MR all presented to the Clinic,

and each purportedly received ESWT from IvanovSP on September 15, 2022; and

(x)    On September 3, 2022, two Insureds – SC and MM – were involved in the same automobile accident. Thereafter, SC and MM both presented to the Clinic, and each purportedly received ESWT from IvanovSP.

166.    It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology that would require experimental ESWT treatments, to the extent ESWT was even medically necessary.  In all of the claims identified for ESWT, the ESWT Defendants falsely represented that the ESWT "treatments" were medically necessary, when, in fact, they were not medically necessary for each Insured, were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols established by the Defendants, and were, therefore, not eligible to collect No-Fault Benefits in the first instance.

**ii.    The Fraudulent Initial Examinations**

167.    The Management Defendants also purported to provide virtually every Insured with an initial examination.

168.    The initial examinations were performed – to the extent they were performed at all – to provide Insureds with predetermined diagnoses to allow Defendants to then provide a host of medically unnecessary or illusory services.

169.    Typically, Coburn, Ivanov, the Coburn Providers, or the Ivanov Providers purported to provide the initial examinations at the Clinic.

170.    Coburn, Ivanov, and the Management Defendants typically billed the initial examinations to GEICO through the Coburn Providers and the Ivanov Providers (the "Examination Defendants") under current procedural terminology ("CPT") codes 99204 or 99205, typically resulting in a charge of $203.76 per exam.

171.    The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants and their illegal kickback scheme, not to treat or otherwise benefit the Insureds.

172.    Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

173.    According to the New York Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99204 typically requires that the physician spend at least 45 minutes of face-to-face time with the Insured or the Insured's family.

174.    According to the New York Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99205 typically requires that the physician spend at least 60 minutes of face-to-face time with the Insured or the Insured's family.

175.    Though the Examination Defendants routinely billed-for the initial examinations under CPT codes 99204 and 99205, no physician associated with the Examination Defendants ever spent 45-60 minutes of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 20 minutes, to the extent that they were conducted at all.

176.    In keeping with the fact that the initial examinations rarely lasted at least 20 minutes, much less 45 minutes or more, the Examination Defendants used boilerplate forms in documenting the initial examinations, setting forth a very limited range of potential patient

complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

177.    All that was required to complete the boilerplate forms was a brief patient interview and a cursory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

178.    These interviews and examinations did not require any physician associated with the Examination Defendants to spend more than 20 minutes of face-to-face time with the Insureds, let alone 60 minutes.

179.    According to the Fee Schedule, the use of CPT codes 99204 and 99205 typically require that the Insured presented with problems of moderate to high severity.

180.    Though the Examination Defendants routinely billed-for the initial examinations under CPT codes 99204 and 99205, the Insureds did not present with problems of moderate severity, let alone moderate-to-high severity, as the result of any automobile accident. Rather, to the extent that the Insureds had any health problems at all as the result of any automobile accidents, the problems almost always were of low severity.

181.    What is more, even though the Insureds almost never presented with problems of moderate-to-high severity as the result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate-to-high severity, the deficient initial examinations performed were incapable of assessing and/or diagnosing problems of such severity.

182.    In addition, according to the Fee Schedule, when the Examination Defendants submitted charges for initial examinations under CPT codes 99204 or 99205, they represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "moderate to high complexity."

a)      Misrepresentations Regarding "Comprehensive" Patient Histories

183.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

184.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

185.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)       constitutional symptoms (e.g., fever, weight loss);
(ii)      eyes;
(iii)     ears, nose, mouth, throat;
(iv)      cardiovascular;
(v)       respiratory;
(vi)      gastrointestinal;
(vii)     genitourinary;
(viii)    musculoskeletal;
(ix)      integumentary (skin and/or breast);
(x)       neurological;
(xi)      psychiatric;
(xii)     endocrine;
(xiii)    hematologic/lymphatic; and
(xiv)     allergic/immunologic.

186.    When the Examination Defendants billed-for the initial examinations under CPT codes 99204 and 99205, they falsely represented that a physician associated with the Examination Defendants took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

187.    In fact, neither Coburn or Ivanov nor any other healthcare provider associated with the Examination Defendants ever took a "comprehensive" patient history from the Insureds they

49

purported to treat during the initial examinations, because they did not document a review of 10 organ systems unrelated to the history of the patients' present illnesses.

188.     Rather, after purporting to provide the initial examinations, the Examination Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

189.     These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services and Fraudulent Pharmaceuticals that the Defendants purported to provide and then billed to GEICO and other insurers.

b)      Misrepresentations Regarding "Comprehensive" Physical Examinations

190.     Moreover, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

191.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

192.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (<u>e.g.</u>, swelling, varicosities) and palpation (<u>e.g.</u>, pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (<u>e.g.</u>, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

193.    When the Examination Defendants billed-for the initial examinations under CPT codes 99204 and 99205, they falsely represented that Coburn and/or Ivanov or another healthcare provider associated with the Examination Defendants performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations.

194.    In fact, neither Coburn or Ivanov nor any other healthcare provider associated with the Examination Defendants ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

195.    For instance, neither Coburn or Ivanov nor any other healthcare provider associated with Defendants ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

196.     Furthermore, although the Examination Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal system during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)     examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)     inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)     coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

c)     Misrepresentations Regarding the Extent of Medical Decision-making

197.     In addition, when the Examination Defendants submitted charges for initial examinations under CPT codes 99204 and 99205, they represented that Coburn or Ivanov or

another physician or physician assistant associated with the Examination Defendants engaged in medical decision-making of "high complexity."

198.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

199.    Though the Examination Defendants routinely falsely represented that their initial examinations involved medical decision-making of "high complexity," in actuality, the initial examinations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

200.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Examination Defendants for "treatment" at the Clinic, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Examination Defendants neither requested any medical records from any other providers, nor reviewed any diagnostic test results.

201.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

202.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Defendants, to the

extent that Defendants provided any such diagnostic procedures or treatment options in the first instance. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying such risks.

203.    In almost every instance, any diagnostic procedures and "treatments" that Defendants actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which were health- or life-threatening if properly administered.

204.    Third, the Examination Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

205.    Rather, to the extent that the initial examinations were conducted in the first instance, the Examination Defendants provided a nearly identical, pre-determined "diagnosis" for the Insureds, and prescribed a similar course of treatment for each Insured.

206.    The Examination Defendants prepared phony initial examination/consultation reports in which they provided boilerplate sprain and strain diagnoses to virtually every Insured.

207.    Based upon these supposed "diagnoses", the Examination Defendants directed Insureds to return to the Clinic, several times per week for medically unnecessary follow-up examinations, physical therapy, diagnostic testing, outcome assessment testing, and ESWT.

208.    The putative results of the initial examinations did not genuinely reflect the Insureds' actual circumstances. Instead, they were designed solely to support the laundry-list of Fraudulent Services that the Provider Defendants purported to perform, as well as to support prescriptions for the Fraudulent Pharmaceuticals, all of which were then billed to GEICO and other insurers.

iii.        **The Fraudulent Follow-Up Examinations**

209.    In addition to the fraudulent initial examinations, the Examination Defendants typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of the Management Defendants' fraudulent treatment protocol.

210.    The Examination Defendants exclusively billed the examinations to GEICO under CPT code 99214, resulting in a charge of $127.41.

211.    Like Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants.

212.    Pursuant to the Fee Schedule, the use of CPT code 99214 typically requires that the Insured present with problems of moderate-to-high severity.

213.    Though the Examination Defendants almost exclusively billed-for the follow-up examinations under CPT codes 99214, the Insureds did not present with problems of moderate-to-high severity. Rather, the Insureds did not have medical problems at all as the result of any automobile accident.

214.    Furthermore, the use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

215.    Though the Examination Defendants billed-for the follow-up examinations using CPT code 99214, no physician associated with the Examination Defendants ever spent 15 minutes, let alone 25 minutes of face-to-face time with the Insureds or their families during the follow-up examinations. Rather, the follow-up examinations rarely lasted more than ten minutes, to the extent that they were conducted at all.

216.    In addition, when the Examination Defendants submitted charges for the follow-up examinations under CPT code 99214, they falsely represented that they performed at least two of the following three components: (i) took a detailed patient history; (ii) conducted a detailed physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

217.    During the purported follow-up evaluation, no physician associated with the Examination Defendants took a "detailed" patient history or "comprehensive" patient history.

218.    Furthermore, during the purported follow-up evaluation, no physician associated with the Examination Defendants conducted a "detailed" or "comprehensive" patient examination.

219.    What is more, during the purported follow-up examinations, no physician associated with the Examination Defendants engaged in medical decision-making of moderate or high complexity.

220.    Instead, in most cases, the Examination Defendants did not actually provide any legitimate follow-up examinations at all and compiled phony boilerplate "follow-up examination" reports out of whole cloth to support their fraudulent treatment and billing protocol.

221.    The phony "follow-up examination" reports that the Examination Defendants compiled falsely suggested that the Insureds continued to suffer from injuries sustained in automobile accidents and required additional Fraudulent Services in order to complete their recovery.

222.    These phony follow-up examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to continue to support the laundry-list of Fraudulent Services that Provider Defendants purported to perform and then billed to GEICO and other insurers.

223.    Based on the fraudulent diagnoses, Defendants directed Insureds to return to the Clinic several times per week for medically unnecessary Fraudulent Services, including diagnostic testing, outcome assessment testing, and ESWT.

**iv.    Fraudulent Outcome Assessment Testing**

224.    In addition to the other Fraudulent Services, the Examination Defendants, pursuant to the Management Defendant's fraudulent billing and treatment protocol, caused bills to be submitted to GEICO representing that the Examination Defendants frequently subjected Insureds to multiple medically useless "outcome assessment tests" on or about the same dates they purported to subject the Insureds to initial or follow-up examinations.

225.    Defendants billed the "outcome assessment tests" allegedly performed by the Examination Defendants to GEICO using CPT code 99358, generally resulting in a charge of $280.12 for each round of "testing."

226.    Like Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were performed, to the extent they were performed at all, pursuant to the fraudulent treatment protocol established by the Management Defendants.

227.    The "outcome assessment tests" that the Examination Defendants purportedly provided to Insureds – to the extent provided at all – were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their daily lives.

228.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests" that the Examination Defendants purportedly provided were nothing more than

a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial and follow-up examinations.

229.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination and then bill separately for contemporaneously-provided "outcome assessment testing."

230.    In the event the Examination Defendants did perform the "outcome assessment tests" for which GEICO was billed, the information gained through the use of the these tests would not have been significantly different from the information that the Examination Defendants purported to obtain during virtually every Insured's initial and follow-up patient history and examinations. In fact, the Examination Defendants, in billing for fraudulent initial and follow-up examinations, represented they took at least a "detailed" if not "comprehensive" patient history and performed at least a "detailed" if not "comprehensive" physical examination.

231.    Under the circumstances employed by the Management Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the Insureds' initial examinations and follow-up examinations. The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered – to the extent rendered at all – pursuant to a predetermined protocol that was designed solely to financially enrich the Defendants and in no way aided in the assessment and treatment of the Insureds.

232.    Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the

physician actually spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Insured and the Insured's family.

233.    Though the Management Defendants almost exclusively submitted billing under CPT code 99358 for "outcome assessment tests" allegedly provided by the Examination Defendants, no physician associated with the Examination Defendants spent an hour reviewing or administering the tests or communicating with the Insureds or their families.

234.    Indeed, the "outcome assessment tests" did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

235.    Nevertheless, the Examination Defendants submitted billing to GEICO for outcome assessment testing under CPT code 99358.

236.    In keeping with the fact that the outcome assessment tests were medically unnecessary and were performed pursuant to the Management Defendants' predetermined fraudulent treatment protocol, the results of the outcome assessment tests, like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

**v.      Fraudulent Neurological Consultations and Electrodiagnostic Testing**

237.    Based upon the fraudulent, predetermined "diagnoses" that Defendants purported to provide to Insureds during the ersatz initial "examinations", Defendants Coburn Providers and Ivanov Providers (collectively with the Management Defendants, "EDX Defendants") purported to subject Insureds to a series of medically unnecessary electrodiagnostic tests, including NCV and EMG tests (collectively, the "electrodiagnostic" or "EDX" tests).

238.    The EDX Defendants virtually always billed to GEICO using CPT code 95913 almost always resulting in charges of $653.46 for NCV tests for each Insured on whom the NCV testing purportedly was performed, and virtually always billed to GEICO using CPT code 95886,

almost always resulting in charges of $202.25 for EMG tests for each Insured on whom the electrodiagnostic testing purportedly was performed.

239.   Like the charges for the other Fraudulent Services, the charges for the neurological consultations and EDX tests were fraudulent in that the neurological consultations and EDX tests were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the Management Defendants' predetermined fraudulent treatment protocol that was designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

240.   In keeping with the fact that the EDX tests were performed as part of a predetermined fraudulent treatment protocol, the examination reports the EDX Defendants submitted with the test billing contained pre-printed boilerplate sections for prognosis, causality, and treatment plan, which most often recommended EDX testing on both the upper and lower extremities.

a)   The Human Nervous System and Electrodiagnostic Testing

241.   The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

242.   Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

243.   The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

244.   Peripheral nerves consist of both sensory and motor fibers. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

245.   The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, loss of muscle control, and alteration of reflexes.

246.   EMG tests and NCV tests are forms of electrodiagnostic tests, and were purportedly provided by the EDX Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

247.   The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

248.   The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

b)      The Fraudulent Charges for NCV Tests

249.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and calculates the speed at which the nerve conducts the impulse over a measured distance from one site to another (the "conduction velocity").

250.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

251.    There are several peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

252.    F-wave and H-reflex studies are additional types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

253.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

254.    Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the EDX Defendants routinely purported to perform testing on far more nerves than recommended by the Recommended Policy.

255.    Specifically, to maximize the fraudulent charges they could submit to GEICO and other insurers, the EDX Defendants routinely purported to perform and/or provide: (i) NCV tests of 4-8 motor nerves; (ii) NCV tests of 4-10 sensory nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies, all supposedly to determine whether the Insureds suffered from a radiculopathy.

256.    The EDX Defendants routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds have radiculopathies or any other medical condition.

257.    For example, the EDX Defendants exclusively billed under CPT Code 95913, which involves the study of 13 or more nerves, resulting in charges approximately $650.00 per Insured per NCV test.

258.    In a legitimate clinic setting, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

259.   The decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

260.   As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

261.   This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

262.   This concept also is emphasized in the CPT Assistant, which states that "[p]re-set protocols automatically testing a large number of nerves are not appropriate."

263.   Even so, the EDX Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

264.   Instead, they applied a fraudulent "protocol" and frequently purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in the NCV test claims billed to GEICO.

265.   Though the NCVs are allegedly rendered to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history and examination performed to create a foundation for the EDX testing. In actuality, NCV tests were provided to Insureds – to the extent they were provided at all – as part of the predetermined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured.

266.   The cookie-cutter approach to the NCV tests that the EDX Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter

approach to the NCV tests was designed solely to maximize the charges that the NCV Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

c)    <u>The Fraudulent Charges for EMG Tests</u>

267.    EMG testing involves the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

268.    Though, in some cases, the EDX Defendants purported to provide EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, the EDX Defendants did not take a proper history or examination of Insureds that would indicate radiculopathy symptoms or signs or any other medical problems arising from any automobile accidents.

269.    In actuality, to the extent that the EDX Defendants purported to provide EMG tests to Insureds at all, the tests were provided as part of the Management Defendants' predetermined, fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

270.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number

of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

271.     Even so, the EDX Defendants did not tailor the EMG tests they purported to provide and/or perform to the unique circumstances of each patient. Instead, the EDX Defendants routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentment.

272.     Furthermore, even if there were any need for any of these EDX tests, the nature and number of the EMG tests that the EDX Defendants purported to provide and/or perform grossly exceed the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

273.     According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

274.     Nonetheless, the EDX Defendants purported to provide and/or perform EMG tests on four limbs, in contravention of the Recommended Policy, solely in order to maximize the fraudulent billing that they could submit to GEICO.

275.     In an effort to conceal the performance of the excessive EMG tests, the EDX Defendants routinely split up the billing for the EMG tests by purportedly providing EMG testing on either an Insured's upper or lower extremities on one date of service and EMG testing on other extremities on a subsequent date of service, usually a week or more later.

276.     The EDX Defendants frequently purported to perform and/or provide EMG tests on muscles in all four limbs for the Insureds solely to maximize the profits that they could reap from each such Insured.

vi.      **The Fraudulent Pharmaceuticals**

277.    Part of the Defendants' fraudulent scheme and predetermined treatment protocol involved the steering of medically unnecessary prescriptions issued in the name of the Prescribing Defendants (i.e., Coburn, Ivanov, or the independent contractors working for either the Coburn Providers or Ivanov Providers) for the Fraudulent Pharmaceuticals to Pitkin Pharmacy, in exchange for kickbacks.

278.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Defendants at the Clinic – including those who received pharmaceuticals from Pitkin Pharmacy – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

279.    Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

280.    More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain

management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

281.    Notably, for a drug to alleviate pain, it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

282.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

283.    Despite these guidelines and the basic goal of helping patients recover in a timely fashion, the Prescriber Defendants produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the Clinic purported to render to Insureds as part of a predetermined protocol which lacked any individualized treatment whatsoever. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products.

284.    Notwithstanding the creation of the examination reports, the Prescriber Defendants' prescriptions for the Fraudulent Pharmaceuticals dispensed by Pitkin Pharmacy were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

285.    In keeping with the predetermined protocols, the Prescriber Defendants' recommendations and prescriptions for Fraudulent Pharmaceuticals remained the same from patient to patient – regardless of each individual patient's history, symptoms, or condition -- as evidenced by the Prescribing Defendants initial evaluation forms.

286.    In fact, the initial evaluation form used by the Prescribing Providers is a boiler-plate form containing a pre-printed list of several medications for the Prescribing Provider to prescribe an individual patient, which list is almost always circled in its entirety by the Prescribing Defendants regardless of the patient's medical history or presentment. An example of such a section is included below:



287.    This pre-printed list of medications, which is almost always circled in its entirety, is not only boilerplate but contains duplicative and excessive pharmaceuticals, further demonstrating the Defendants' use of a predetermined protocol designed to maximize profits.

288.    For example, the pre-printed list of medications includes both Motrin and Naproxen, which are NSAIDs and medically duplicative of one another. Similarly, the section includes both Nexium and Omepraloze, which are proton-pump inhibitors also medically duplicative of one another.

289.    The Prescriber Defendants' hand-circled list of excessive, duplicative medications demonstrates a lack of individualized patient care and supports the existence of a predetermined treatment protocol at the Clinic related to prescribing Fraudulent Pharmaceuticals.

290.    Other medical providers at the Clinic also provided prescriptions for Fraudulent Pharmaceuticals that were directed to Pitkin Pharmacy pursuant to the predetermined protocols. Oftentimes, they wrote the prescriptions on "prescription order forms" ("Prescription Order Forms"), which, like the initial evaluation forms used by the Prescriber Defendants, contained a pre-printed list of several medications for the provider to prescribe to an individual patient.

291.    Similar to the boilerplate pre-printed list in the initial evaluation form, the Pharmacy Defendants created and supplied the Prescription Order Forms to providers at the Clinic to make it as convenient as possible for them to prescribe, or cause to be prescribed, the Fraudulent Pharmaceuticals and direct those prescriptions to Pitkin Pharmacy.

292.    Prescribing a multitude of pharmaceutical drug products without first taking or taking into account each individual patient's medical history and presentment demonstrates a gross indifference to patient health and safety as the Prescribing Defendants disregarded whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

293.    The Prescribing Defendants also did not document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for the Fraudulent Pharmaceuticals dispensed by Pitkin Pharmacy.

294.    The Prescribing Defendants also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient

and dispensed by Pitkin Pharmacy were actually used by the patient and, if so, whether they provided any pain relief or were otherwise effective for the purpose prescribed.

295.    In fact, the Prescribing Defendants most often failed to document in any of their follow-up examination reports that the patient even received a Fraudulent Pharmaceutical.

296.    In accordance with the fraudulent scheme discussed above, and despite the best practices outlined above, the Pharmacy Defendants primarily and routinely billed GEICO for exorbitantly priced Lidocaine 5% Ointment, pursuant to duplicitous prescriptions issued by the Prescribing Defendants in exchange for kickbacks or other financial incentives.

297.    The Defendants chose to include prescriptions for the Fraudulent Pharmaceuticals as part of their predetermined protocol because of their potential high profits. For example, Pitkin Pharmacy was provided with voluminous prescriptions for Lidocaine 5% ointment because it could readily buy Lidocaine 5% Ointment at low cost and bill GEICO and other New York No-Fault insurers huge sums.

298.    The Office of the Inspector General of the U.S. Department of Health and Human Services noted that Lidocaine has been one of the most common products subject to fraud and abuse by pharmacies with questionable billing.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

299.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

300.    Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison

sumac, and abrasions of the skin, or as a topical anesthetic for minor procedures such as sutures or injections.

301.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.

302.    In fact, the Food and Drug Administration is continuing to evaluate the potential negative health effects of Lidocaine and issued an advisory on March 26, 2024, warning that Lidocaine has the potential for dangerous health effects for patients in certain circumstances, including during or after cosmetic procedures, tattooing, piercing, etc. See Press Release, FDA Warns Consumers to Avoid Certain Topical Pain Relief Products Due to Potential for Dangerous Health Effects (Mar. 26, 2024).

303.    Given the potential adverse effects, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams. However, the Prescribing Defendants virtually never indicated the maximum dosage on any prescriptions.

304.    Moreover, the Prescribing Defendants never recommended Insureds first use over-the-counter Lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents.

305.    In fact, lidocaine ointments and patches with 4% Lidocaine, as well Lidocaine creams with 5% Lidocaine, are available over-the-counter at a fraction of the cost.  For example, over-the-counter products such as Icy Hot Lidocaine, which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the

range of $10 or less.  Lidocaine creams with 5% Lidocaine area also available from well-known pharmacy retailers such as Walmart for advertised prices in the range of $16 or less.

306.    Despite the widespread availability of over-the-counter Lidocaine products, the Prescribing Defendants routinely prescribed prescription Lidocaine Ointment products and directed the prescriptions to Pitkin Pharmacy, which typically resulted in charges of between $1,222.60 and $1,528.80 per prescription.  They did so because of the collusive arrangements and predetermined protocols that were in place to maximize profits without regard to patient care.

307.    In keeping with the fact that the Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribing Defendants virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.

308.    Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

309.    In addition to the egregious number of Lidocaine 5% Ointment prescriptions, the Pharmacy Defendants submitted bills to GEICO seeking reimbursement for expensive 20 mg delayed release esomeprazole magnesium oral capsules pursuant to duplicitous prescriptions issued by the Prescribing Defendants in exchange for kickbacks or other financial incentives and typically resulting in charges of between $414.00 to $438.00 per prescription.

310.    One of the most popular brand names for esomeprazole magnesium is Nexium, which is also available over the counter in delayed release 20 mg pills from well-known pharmacy retailers such as Walmart for advertised prices in the range of $25 to $30.

311.     Despite best practice and the risks discussed above – and in keeping with the fact that the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to illegal kickbacks and predetermined protocols without regard for genuine patient care – the Prescribing Defendants often prescribed, or caused to be prescribed, the same set of Fraudulent Pharmaceuticals over and over again, regardless of individual patients' medical histories, symptoms, or accident circumstances.

312.     As evidence of Rubinov and Pitkin Pharmacy's involvement in predetermined protocols and collusive financial arrangements with the Management Defendants, the Prescribing Defendants at the Clinic routinely prescribed the same four Fraudulent Pharmaceuticals for Insureds, which were subsequently dispensed by Pitkin Pharmacy. For example:

(i)      An Insured named JA was allegedly involved in an automobile accident on December 5, 2021. JA later went to the Clinic and began treatment with Coburn through Elmhurst Medical. During the course of JA's treatment, Coburn allegedly prescribed JA the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(ii)     An Insured named LA was allegedly involved in an automobile accident on April 10, 2022. LA later went to the Clinic and began treatment with Marte through Elmhurst Medical. During the course of LA's treatment, Marte allegedly prescribed LA the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(iii)    An Insured named MB was allegedly involved in an automobile accident on February 17, 2022. MB later went to the Clinic and began treatment with Marte through Elmhurst Medical. During the course of MB's treatment, Marte allegedly prescribed MB the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(iv)    An Insured named DB was allegedly involved in an automobile accident on May 27, 2021. DB later went to the Clinic and began treatment with

Anthony Guan ("Guan") through CoburnSP. During the course of DB's treatment, Guan allegedly prescribed DB the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(v)     An Insured named RC was allegedly involved in an automobile accident on June 9, 2021. RC later went to the Clinic and began treatment with Guan through CoburnSP. During the course of RC's treatment, Guan allegedly prescribed RC the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(vi)    An Insured named KD was allegedly involved in an automobile accident on January 28, 2022. KD later went to the Clinic and began treatment with Marte through Elmhurst Medical. During the course of KD's treatment, Marte allegedly prescribed KD the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(vii)   An Insured named KO was allegedly involved in an automobile accident on June 7, 2023. KO later went to the Clinic and began treatment with Marte through VLI Medical. During the course of KO's treatment, Marte allegedly prescribed KO the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(viii)  An Insured named LH was allegedly involved in an automobile accident on April 1, 2022. LH later went to the Clinic and began treatment with Marte through IvanovSP. During the course of LH's treatment, Marte allegedly prescribed LH the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(ix)    An Insured named HV was allegedly involved in an automobile accident on September 13, 2022. HV later went to the Clinic and began treatment with Marte through IvanovSP. During the course of HV's treatment, Marte allegedly prescribed HV the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet; and

(x)     An Insured named LM was allegedly involved in an automobile accident on January 14, 2023. LM later went to the Clinic and began treatment with Marte through VLI Medical. During the course of LM's treatment, Marte allegedly prescribed LM the following pharmaceuticals that were dispensed by Pitkin Pharmacy: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet.

313.    In keeping with the Defendants' predetermined protocol, the Prescribing Defendants at the Clinic routinely prescribed, and Pitkin Pharmacy routinely dispensed, the same four Fraudulent Pharmaceuticals to multiple Insureds who were involved in the same motor vehicle accident, without regard to their different ages, heights, weights, physical conditions – and without regard to individualized, genuine patient care.

314.    It is extremely improbable that multiple Insureds involved in the same automobile accident would routinely require the same exact pharmaceutical products and would routinely have those prescriptions dispensed by the same pharmacy.  Nevertheless, for example:

(i)     On November 21, 2022, four Insureds – DR, JR, MR, and JRF – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, DR, JR, MR, and JRF were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(ii)    On January 6, 2021, two Insureds – ET and JT – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, ET and JT were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(iii)   On January 29, 2023, four Insureds – JCN, RLC, DSQ, and JB – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, JNC, RLC, DSQ, and JB were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin

Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(iv)     On December 2, 2021, two Insureds –JR and PL – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JR and PL were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(v)     On March 4, 2023, two insureds – MJ and JH – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, MJ and JH were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(vi)      March 20, 2021, two insureds – MES and JES – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, MES and JES were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(vii)     On January 14, 2023, three Insureds – LM, GCP, and GL – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, LM, GCP, and GL were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(viii)     On July 29, 2020, two insureds – RG and JG – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, RG and JG were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet;

(ix)    On June 29, 2022, two insureds – MB and JC – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, MB and JC were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet; and

(x)    On September 27, 2022, two insureds – SB and LB – were involved in the same motor vehicle accident and were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, SB and LB were directed to take the same four Fraudulent Pharmaceuticals, which were dispensed by Pitkin Pharmacy, including: (i) Lidocaine 5% ointment; (ii) naproxen sodium oral tablets; (iii) esomeprazole magnesium oral capsule delayed release; and (iv) cyclobenzaprine HCL oral tablet.

315.    The Fraudulent Pharmaceuticals were prescribed pursuant to collusive arrangements and predetermined treatment protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA approved medications with proven therapeutic effects available over the counter at a fraction of the cost.

316.    There is no legitimate medical reason for the Prescribing Defendants to prescribe large volumes of the Fraudulent Pharmaceuticals to Insureds – and for the Defendants to dispense those products -- particularly given the availability of over-the-counter medications, and the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed. Such review shall include screening for potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic drug duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

317.    The Defendants, to-date, have submitted over $565,000.00 in claims to GEICO seeking reimbursement for Lidocaine 5% Ointment.

318.    The Defendants, to-date, have submitted over $128,000.00 in claims to GEICO seek reimbursement for Esomeprazole Magnesium oral delayed release capsules.

319.    The Defendants' egregious billing coupled with the fact that the Prescribing Defendants often failed to properly document the Insureds' need for or use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Defendants to have prescribed large volumes of these medications to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

**vii.    The Predetermined Protocol of Physical Therapy Treatment**

320.    Consistent with the excessive and fraudulent provision of the healthcare services Defendants purported to provide to Insureds at the Clinic, Nasef and Kinetic Approach (collectively with the Management Defendants, the "PT Defendants") purported to subject virtually every Insured to a predetermined physical therapy regimen, at the direction of the Management Defendants.

321.    Like Defendants' charges for the other Fraudulent Services, the charges for physical therapy treatment were fraudulent in that the physical therapy treatment was performed – to the extent it was performed at all – pursuant to the Management Defendants' directive, illegal kickbacks, and the fraudulent treatment protocol established by Defendants.

322.    The charges for the physical therapy that was allegedly provided through the PT Defendants also misrepresented the PT Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance.

323.    In most cases, the PT Defendants purported to subject each Insured to dozens of physical therapy treatments over an extended period of time, generally resulting in thousands of dollars of charges for each Insured.

324.     In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after an hour or two.

325.     Nonetheless, pursuant to Defendants' fraudulent treatment and billing protocol, following their initial examination and follow-up examinations, virtually every Insured was prescribed a predetermined, extended course of physical therapy.

**E.     The Fraudulent Billing for Independent Contractor Services**

326.     The Defendants' fraudulent scheme also included the submission of claims to GEICO using the Coburn Providers, Ivanov Providers, and Kinetic Approach seeking payment for services provided by individuals that the Coburn Providers, Ivanov Providers, and Kinetic Approach never employed.

327.     Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors.  The healthcare services must be provided by the billing provider itself, or by its direct employees.

328.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the professional corporation and is not an employee under the direct supervision of a professional corporation owner, the professional corporation is not authorized to bill under No-Fault as a licensed provider of those services"); DOI

Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the professional corporation as an independent contractor, and is not an employee or shareholder of the professional corporation, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the professional corporation, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

329.   From June 2021 through the present, more than two thousand separate bills were sent to GEICO using the United States mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Coburn, Ivanov, or anyone employed by them, while falsely representing in every bill that that the individual performing the services was employed by the Coburn Providers or the Ivanov Providers. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation had been made regarding their relationship to the billing provider, which was being unlawfully operated and controlled by the Management Defendants.

330.   These statements in each of the NF-3 forms were false and fraudulent in that physicians' assistants actually performing the Fraudulent Services were never: (i) employed by the Coburn Providers or Ivanov Providers; or (ii) under their direction and/or control. In fact, the physicians' assistants were simultaneously performing services for multiple other "providers" being operated and controlled by the Management Defendants and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

331.    In keeping with the fact that the physicians' assistants performed the Fraudulent Services under the operation and control by the Management Defendants, without regard to the physician's name or entity that billed-for the Fraudulent Services, virtually all of the Insureds received ESWT from the same physician assistant on behalf of more than one of the ESWT Defendants. For example:

(i)      An Insured named EC was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, EC purportedly received ESWT from a physician assistant named Camille Bosquet ("Bosquet") on behalf of CoburnSP, Elmhurst Medical, and IvanovSP.

(ii)     An Insured named VB was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, VB purportedly received ESWT from Bosquet on behalf of both CoburnSP and Elmhurst Medical.

(iii)    An Insured named GB was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, GB purportedly received ESWT from a physician assistant named Venecia Mercedes Marte (Marte) on behalf of both Elmhurst Medical and IvanovSP.

(iv)     An Insured named RC was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, RC purportedly received ESWT from Marte on behalf of both Elmhurst Medical and IvanovSP.

(v)      An Insured named JR was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, JR purportedly received ESWT from Marte on behalf of both IvanovSP and VLI.

(vi)     An Insured named JO was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, JO purportedly received ESWT from Bosquet Marte on behalf of both CoburnSP and Elmhurst Medical.

(vii)    An Insured named RD was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, RD purportedly received ESWT from Marte on behalf of both Elmhurst Medical and IvanovSP.

(viii)   An Insured named TM was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, TM purportedly received ESWT from Marte on behalf of both Elmhurst Medical and IvanovSP.

     (ix)    An Insured named LAM was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, LAM purportedly received ESWT from Marte on behalf of both Elmhurst Medical and IvanovSP.

     (x)    An Insured named JAS was involved in an automobile accident and presented to the Clinic. While treating at the Clinic, JAS purportedly received ESWT from Marte on behalf of both Elmhurst Medical and IvanovSP. In addition to ESWT treatment, JAS received EMG treatment from Marte on behalf of VLI.

332.    In addition to the representative examples above, there were a number of occasions where Marte allegedly performed services for two of the ESWT Defendants on the same day. For example, she allegedly performed ESWT on Insureds on behalf of both Elmhurst Medical and IvanovSP on September 6, 2022, September 22, 2022, and October 20, 2022.

333.    In addition to using independent contractors to perform ESWT treatment on Insureds at the Clinic, the Management Defendants used independent contractors to provide NCV and EMG testing as well. For example, Isakova, who became a licensed physician in New York in 2006, allegedly performed NCV and EMG testing on Insureds on behalf of Elmhurst Medical and IvanovSP. During the same time period, she was also providing those services for: (i) NY Wellness Medical P.C.; (ii) Corona Medical Plaza P.C.; (iii) S&R Medical P.C.; (iv) Jaga Medical Services, P.C.; (v) Kings County Physicians Group PLLC; (vi) Bronx Medical Services 21 P.C., (vii) Neptune Medical Services P.C.; and (viii) under her own name and tax identification number.

334.    Similarly, Esther Chaim, M.D. ("Chaim") who became a licensed physician in New York in 2003, allegedly performed NCV and EMG testing on Insureds at the Clinic on behalf of Elmhurst Medical at the same time she was providing those services for Mount Hollis Medical P.C. and ESWT for her own practice, Esther Chaim Medical, P.C. In fact, per billing received by GEICO, Chaim purportedly provided services on behalf of numerous Insureds for two of the three professional corporations on the same date of service from different clinics. Notably, Mount Hillis

Medical is allegedly owned by Max Jean-Gilles, M.D., who has been sued numerous times for his involvement in No-Fault insurance fraud schemes like the present, and who allegedly performed NVC and EMG testing for the Coburn Providers. See Gov't Emp. Ins. Co. et al. v. Jean-Gilles, et al.,1:22-cv-05353-LDH-PK (E.D.N.Y. 2022); State Farm Mut. Auto. Ins. Co. et al. v. Tandingan P.T. P.C. et al., 1:22-cv-01582-NRM-CLP (E.D.N.Y. 2022); Gov't Emp. Ins. Co. et al. v. Gabriel Medical, P.C. et al., 1:17-cv-03125-AMD-JO (E.D.N.Y. 2017); Gov't Emp. Ins. Co. et al. v. Jean-Gilles, M.D. et al., 1:14-cv-05444-ERK-JO (E.D.N.Y. 2014).

335.    In addition to using independent contractors to perform Fraudulent Services for the Coburn Providers and the Ivanov Providers, the Management Defendants employed independent contractors to perform services for Kinetic Approach. For example, Christine Pomoposo, who became a licensed physical therapist in New York in 2020, allegedly provided physical therapy services for Insureds at the Clinic on behalf of Kinetic Approach during the same time frame she was also providing physical therapy services to Bright Star Rehab PT PC and Neighborhood Physical Therapy, P.C.  Bright Star Rehab is owned by Mohammed El Sayed, P.T., who himself has been sued numerous times for his involvement in selling the use of his physical therapy license and control over his physical therapy corporations to laypersons. See .e.g., Liberty Mutual Ins. Co. et al. v. New Arena et al., 1:24-cv-01646-DG-JRC (E.D.N.Y. 2024); Liberty Mutual Ins. Co. et al. v. Eldar Kadymoff Medical, P.C. et al., 2:20-cv-02293-PKC-CLP (E.D.N.Y. 2020); Liberty Mutual Ins. Co. et al. v. Moon Rehab PT, P.C., et al., 1:17-cv-03803-AMD-VMS (E.D.N.Y. 2017); Gov't Emp. Ins. Co. et al. v. Ajudua, M.D. et al., 1:15-cv-05199-MKB-RLM (E.D.N.Y. 2015).

336.    Virtually all of the Insureds who were billed by Kinetic Approach were treated by independent contractors who are employed by the Management Defendants to perform the

Fraudulent Services on Insureds. The Fraudulent Services were then billed to GEICO and other New York automobile insurers through multiple healthcare providers.

337. Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by the Provider Defendants, the Defendants never had any right to bill for or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

**III.**   **The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

338. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs, and medical reports/records using the name and tax identification numbers of the Provider Defendants and Pitkin Pharmacy seeking payment for the Fraudulent Services and Fraudulent Pharmaceuticals for which the Defendants were not entitled to receive payment.

339. The NF-3 forms, reports, AOBs, and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

> (i)    The NF-3 forms, letters, and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Provider Defendants had performed the Fraudulent Services and that their name, license, and the tax identification numbers of the Provider Defendants were being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the Management Defendants unlawfully and secretly owned, controlled, and operated each medical "practice";

> (ii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly misrepresented and

exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided;

(iii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services and Fraudulent Pharmaceuticals were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements;

(iv)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services and Fraudulent Pharmaceuticals were medically necessary when the Fraudulent Services and Fraudulent Pharmaceuticals were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

(v)   The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by unlicensed individuals not employed by the Provider Defendants or either of the Provider Defendants.

## IV.   **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

340.   Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

341.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services and Fraudulent Pharmaceuticals, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme, and went to great lengths to accomplish this concealment.

342.   Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of the Provider Defendants in the performance of the Fraudulent Services and the Provider Defendants' ownership, control and/or management of their respective Provider Defendants. Additionally, the Defendants entered into complex financial arrangements with one

another, including Pitkin Pharmacy, that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

343.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services and Fraudulent Pharmaceuticals were medically unnecessary and provided, to the extent they were provided at all, pursuant to fraudulent predetermined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services and Fraudulent Pharmaceuticals.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals that were employed by the Provider Defendants.

344.    GEICO takes steps to timely respond to all claims and to ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1.2 million based upon the fraudulent charges.

345.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Coburn, Elmhurst Medical, Ivanov, VLI Medical,**
**Kinetic Approach, and Pitkin Pharmacy**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

346.     GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

347.     There is an actual case and controversy between GEICO on the one hand and the Provider Defendants and Pitkin Pharmacy on the other hand regarding more than $1.9 million in unpaid billing for the Fraudulent Services that were submitted to GEICO.

348.     The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the billed-for services were submitted through medical practices not legitimately owned or controlled by licensed medical professionals, but which were being operated, managed, and controlled by the Management Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

349.     The Provider Defendants and Pitkin Pharmacy have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services and Fraudulent Pharmaceuticals were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

350.     The Provider Defendants and Pitkin Pharmacy have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services and Fraudulent Pharmaceuticals were not medically necessary and were provided – to the extent they were provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinic.

351.   The Provider Defendants and Pitkin Pharmacy have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services and the Fraudulent Pharmaceuticals were not medically necessary and were provided – to the extent they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

352.   The Provider Defendants and Pitkin Pharmacy have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services and the Fraudulent Pharmaceuticals were intentionally targeted to inflate the billing and/or were fraudulently misrepresented and exaggerated in order to inflate the charges submitted to GEICO.

353.   The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by the Provider Defendants and were instead performed - to the extent they were provided at all - by independent contractors who were neither supervised by nor employed by Provider Defendants.

354.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants and Pitkin Pharmacy have no right to receive payment for any pending bills submitted to GEICO.

<u>**SECOND CAUSE OF ACTION**</u>
**Against Kinetic Approach, Nasef, Pinkhasov, and John Doe Defendants**
**(Common Law Fraud)**

355.   GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

356.   The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their

submission of thousands of fraudulent charges seeking payment for the Fraudulent Services through Kinetic Approach.

357.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Kinetic Approach was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and secretly and illegally owned, operated, and controlled by the Management Defendants; (ii) in every claim, the representation that Nasef had performed the Fraudulent Services and that his name, license and the tax identification number of Kinetic Approach were being legitimately used to bill for the Fraudulent Services, when in fact Nasef never performed any of the services and Management Defendants unlawfully and secretly controlled, operated and managed Kinetic Approach; (iii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iv)in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinic; (v) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (vi) in many claims, the representation that the billed-for services were eligible for payment because the services were provided by Nasef, when in fact the services were provided by individuals that were never supervised by Nasef nor employed by Kinetic Approach.

358.     Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Kinetic Approach that were not compensable under New York no-fault insurance laws.

359.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $674,000.00 pursuant to the fraudulent bills submitted by the Defendants. The fraudulent billings submitted to GEICO identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

360.     Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

361.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Kinetic Approach, Nasef, Pinkhasov, and John Doe Defendants**
**(Unjust Enrichment)**

362.     GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

363.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

364.     When GEICO paid the bills and charges submitted by or on behalf of Kinetic Approach for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

365.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

366.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

367.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $674,000.00.

**FOURTH CAUSE OF ACTION**
**Against Nasef, Pinkhasov, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

368.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

369.    Kinetic Approach is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

370.    Nasef, Pinkhasov, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Kinetic Approach's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Kinetic Approach was not eligible to receive under the No-Fault Laws because: (i) Kinetic Approach was not eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) as Pinkhasov and the John Doe Defendants unlawfully and secretly controlled, operated and managed Kinetic Approach in violation of law; (ii) the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of

the services that purportedly were provided; (iii) the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements; (iv) the billed-for services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the services were provided by individuals that were never supervised by Nasef nor employed by Kinetic Approach. The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

371.    Kinetic Approach's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud and wire fraud are the regular ways in which Nasef, Pinkhasov, and John Doe Defendants operated Kinetic Approach, inasmuch as Kinetic Approach never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud and wire fraud therefore were essential in order for Kinetic Approach to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Kinetic Approach to the present day.

372.    Kinetic Approach is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Kinetic Approach in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

373.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $674,000.00 pursuant to the fraudulent bills submitted by the Defendants through Kinetic Approach.

374.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Nasef, Pinkhasov, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

375.     GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

376.     Kinetic Approach is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

377.     Nasef, Pinkhasov, and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Kinetic Approach's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Kinetic Approach was not eligible to receive under the No-Fault Laws because (i) Kinetic Approach was not eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) as Pinkhasov and the John Doe Defendants unlawfully and secretly controlled, operated and managed Kinetic Approach in violation of law; (ii) the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the services were

provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements; (iv) the billed-for services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the services were provided by individuals that were never supervised by Nasef nor employed by Kinetic Approach.  The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

378.    Nasef, Pinkhasov, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

379.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $647,000.00 pursuant to the fraudulent bills submitted by Defendants through Kinetic Approach.

380.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against Coburn, Pinkhasov, and John Doe Defendants**
**(Common Law Fraud)**

381.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

382.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their

submission of thousands of fraudulent charges seeking payment for the Fraudulent Services through CoburnSP.

383.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Coburn's  name, license and tax identification number was being legitimately used to bill for the Fraudulent Services by CoburnSP, making of CoburnSP eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Pinkhasov and the John Doe Defendants unlawfully and secretly controlled, operated and managed CoburnSP and Coburn's medical license; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinic; (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in many claims, the representation that the billed-for services were eligible for payment because the services were provided by Coburn, when in fact the services were provided by individuals that were never supervised by Coburn nor employed by CoburnSP.

384.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CoburnSP that were not compensable under New York no-fault insurance laws.

385.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $81,000.00 pursuant to the fraudulent bills submitted by the Defendants. The fraudulent billings identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

386.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

387.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Coburn, Pinkhasov, and John Doe Defendants**
**(Unjust Enrichment)**

388.    GEICO incorporates, as though fully set forth herein, each and every allegation in this Complaint as if fully set forth at length herein.

389.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

390.    When GEICO paid the bills and charges submitted by or on behalf of CoburnSP for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

391.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

392.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

393.     By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $81,000.00.

<u>EIGHTH CAUSE OF ACTION</u>
**Against Elmhurst Medical, Coburn, Pinkhasov, and John Doe Defendants**
**(Common Law Fraud)**

394.     GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

395.     The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services through Elmhurst Medical.

396.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Elmhurst Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and secretly and illegally owned, operated, and controlled by the Management Defendants; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinic; (iv) in every claim, the representation that the billed-for services were

medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in many claims, the representation that the billed-for services were eligible for payment because the services were provided by Coburn, when in fact the services were provided by individuals that were never supervised by Coburn nor employed by Elmhurst Medical.

397. Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Elmhurst Medical that were not compensable under New York no-fault insurance laws.

398. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $143,000.00 pursuant to the fraudulent bills submitted by the Defendants. The fraudulent billings identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

399. Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

400. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Elmhurst Medical, Coburn, Pinkhasov, and John Doe Defendants**
**(Unjust Enrichment)**

401. GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

402.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

403.    When GEICO paid the bills and charges submitted by or on behalf of Elmhurst Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

404.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

405.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

406.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $143,000.00.

## TENTH CAUSE OF ACTION
### Against Coburn, Pinkhasov, and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

407.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

408.    Elmhurst Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

409.    Coburn, Pinkhasov, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Elmhurst Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges on a

continuous basis for nearly two years seeking payments that Elmhurst Medical was not eligible to receive under the No-Fault Laws because: (i) Elmhurst Medical was not eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) as Pinkhasov and the John Doe Defendants unlawfully and secretly controlled, operated and managed Elmhurst Medical in violation of law; (ii) the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements; (iv) the billed-for services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the services were provided by individuals that were never supervised by Coburn nor employed by Elmhurst Medical. The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

410.  Elmhurst Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud and wire fraud are the regular ways in which Coburn, Pinkhasov, and John Doe Defendants operated Elmhurst Medical, inasmuch as Elmhurst Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud and wire fraud therefore were essential in order for Elmhurst Medical to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Elmhurst Medical to the present day.

411.    Elmhurst Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Elmhurst Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

412.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $143,000.00 pursuant to the fraudulent bills submitted by the Defendants through Elmhurst Medical.

413.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Coburn, Pinkhasov, and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

414.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

415.    Elmhurst Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

416.    Coburn, Pinkhasov, and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Elmhurst Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for nearly two years seeking payments that Elmhurst Medical was not eligible to receive under the No-Fault Laws because(i)

102

Elmhurst Medical was not eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) as Pinkhasov and the John Doe Defendants unlawfully and secretly controlled, operated and managed Elmhurst Medical in violation of law; (ii) the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements; (iv) the billed-for services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the services were provided by individuals that were never supervised by Coburn nor employed by Elmhurst Medical.  The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

417.    Coburn, Pinkhasov, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

418.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $143,000.00 pursuant to the fraudulent bills submitted by Defendants through Elmhurst Medical.

419.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Ivanov, Pinkhasov, and John Doe Defendants**
**(Common Law Fraud)**

420.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

421.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services through IvanovSP.

422.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Ivanov's name, license and the tax identification number of IvanovSP were being legitimately used to bill for the Fraudulent Services by IvanovSP, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Pinhasov and the John Doe Defendants unlawfully and secretly controlled, operated and managed IvanovSP and Ivanov's medical license; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinic; (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in many claims, the representation the billed-for services were eligible for payment because the services were provided by Ivanov, when in fact the services were provided by individuals that were never supervised by Ivanov nor employed by IvanovSP.

423.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through IvanovSP that were not compensable under New York no-fault insurance laws.

424.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $79,000.00 pursuant to the fraudulent bills submitted by the Defendants. The fraudulent billings identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

425.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

426.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Ivanov, Pinkhasov, and John Doe Defendants**
**(Unjust Enrichment)**

427.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

428.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

429.    When GEICO paid the bills and charges submitted by or on behalf of IvanovSP for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

430.     Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

431.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

432.     By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $79,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against VLI Medical, Ivanov, Pinkhasov, and John Doe Defendants
### (Common Law Fraud)

433.     GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

434.     The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services through VLI Medical.

435.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that VLI Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and secretly and illegally owned, operated, and controlled by the Management Defendants; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that

the billed-for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinic; (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in many claims, the representation the billed-for services were eligible for payment because the services were provided by Ivanov, when in fact the services were provided by individuals that were never supervised by Ivanov nor employed by VLI Medical.

436. Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through VLI Medical that were not compensable under New York no-fault insurance laws.

437. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $97,000.00 pursuant to the fraudulent bills submitted by the Defendants. The fraudulent billings identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

438. Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

439. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against VLI Medical, Ivanov, Pinkhasov, and John Doe Defendants
### (Unjust Enrichment)

440.     GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

441.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

442.     When GEICO paid the bills and charges submitted by or on behalf of VLI Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

443.     Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

444.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

445.     By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $97,000.00.

### SIXTEENTH CAUSE OF ACTION
**Against Ivanov, Pinkhasov, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

446.     GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

447.     VLI Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

448.     Ivanov, Pinkhasov, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of VLI Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for nearly two years seeking payments that VLI Medical was not eligible to receive under the No-Fault Laws because: (i) VLI Medical was not eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) as Pinkhasov and the John Doe Defendants unlawfully and secretly controlled, operated and managed VLI Medical in violation of law; (ii) the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements; (iv) the billed-for services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the services were provided by individuals that were never supervised by Ivanov nor employed by VLI Medical.  The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

449.    VLI Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud and wire fraud are the regular ways in which Ivanov, Pinkhasov, and John Doe Defendants operated VLI Medical, inasmuch as VLI Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud and wire fraud therefore were essential in order for VLI Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that Defendants

continue to attempt collection on the fraudulent billing submitted through VLI Medical to the present day.

450.    VLI Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by VLI Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

451.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $97,000.00 pursuant to the fraudulent bills submitted by the Defendants through VLI Medical.

452.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**Against Ivanov, Pinkhasov, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

453.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

454.    VLI Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

455.    Ivanov, Pinkhasov, and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of VLI Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds

of fraudulent charges on a continuous basis for nearly two years seeking payments that VLI Medical was not eligible to receive under the No-Fault Laws because(i) VLI Medical was not eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) as Pinkhasov and the John Doe Defendants unlawfully and secretly controlled, operated and managed VLI Medical in violation of law; (ii) the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements; (iv) the billed-for services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the services were provided by individuals that were never supervised by Ivanov nor employed by VLI Medical.  The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

456.    Ivanov, Pinkhasov, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

457.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $97,000.00 pursuant to the fraudulent bills submitted by Defendants through VLI Medical.

458.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Pitkin Pharmacy, Rubinov, Pinkhasov, and John Doe Defendants
### (Common Law Fraud)

459.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

460.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services through Pitkin Pharmacy.

461.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Pharmaceuticals were medically necessary and properly billed when in fact the Fraudulent Pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (ii) in every claim the representation that Pitkin Pharmacy was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which Pinkhasov and the John Doe Defendants steered the Prescribing Defendants to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Pitkin Pharmacy in exchange for unlawful kickbacks and other financial incentives, making them ineligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) and (iii) in every claim, the representation that Pitkin Pharmacy acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent

Pharmaceuticals) that that they acquired at low cost and had Pitkin Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain.

462.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Pitkin Pharmacy that were not compensable under New York no-fault insurance laws.

463.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted by the Defendants. The fraudulent billings identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

464.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

465.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against Pitkin Pharmacy, Rubinov, Pinkhasov, and John Doe Defendants**
**(Unjust Enrichment)**

466.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

467.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

468.    When GEICO paid the bills and charges submitted by or on behalf of Pitkin Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

469.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

470.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

471.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $170,000.00.

### TWENTIETH CAUSE OF ACTION
**Against Rubinov, Pinkhasov, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

472.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

473.    Pitkin Pharmacy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

474.    Rubinov, Pinkhasov, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Pitkin Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Pitkin Pharmacy was not eligible to receive under the No-Fault Laws because: (i) Pitkin Pharmacy submitted claims for Fraudulent

Pharmaceuticals that were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) Pitkin Pharmacy engaged in illegal kickback, referral and fee-splitting arrangements with unlicensed individuals and entities as part of a scheme to defraud New York automobile insurers; and (iii) Pitkin Pharmacy and Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Pharmaceuticals) that that they acquired at low cost and had Pitkin Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain.

475.    The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

476.    Pitkin Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud and wire fraud are the regular ways in which Rubinov, Pinkhasov, and John Doe Defendants operated Pitkin Pharmacy, inasmuch as Pitkin Pharmacy never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud and wire fraud therefore were essential in order for Pitkin Pharmacy to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Pitkin Pharmacy to the present day.

477.    Pitkin Pharmacy is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently

unlawful acts are taken by Pitkin Pharmacy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

478.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted by the Defendants through Pitkin Pharmacy.

479.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION**
**Against Rubinov, Pinkhasov, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

480.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

481.    Pitkin Pharmacy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

482.    Rubinov, Pinkhasov, and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Pitkin Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Pitkin Pharmacy was not eligible to receive under the No-Fault Laws because (i) Pitkin Pharmacy submitted claims for Fraudulent Pharmaceuticals that were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined

fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) Pitkin Pharmacy engaged in illegal kickback, referral and fee-splitting arrangements with unlicensed individuals and entities as part of a scheme to defraud New York automobile insurers; and (iii) Pitkin Pharmacy and Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Pharmaceuticals) that that they acquired at low cost and had Pitkin Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain.   The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

483.    Rubinov, Pinkhasov, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

484.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted by Defendants through Pitkin Pharmacy.

485.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Coburn, Ivanov, Nasef, Rubinov, Pinkhasov,**
**and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

486.    GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

487.    Elmhurst Medical, VLI Medical, Kinetic Approach, and Pitkin Pharmacy together constitute an association-in-fact "enterprise" (the "Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

488.    The members of the Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Elmhurst Medical, VLI Medical, Kinetic Approach, and Pitkin Pharmacy are ostensibly independent businesses or – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

489.    The Enterprise operated under six names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual tax identification number, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Enterprise acting singly or without the aid of each other.

490.    The Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating

and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

491.     Coburn, Ivanov, Nasef, Rubinov, Pinkhasov, and the John Doe Defendants have each been employed by and/or associated with the Enterprise.

492.     Coburn, Ivanov, Nasef, Rubinov, Pinkhasov, and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Enterprise was not eligible to receive under the No-Fault Laws because: (i) Elmhurst Medical, VLI Medical and Kinetic Approach were fraudulently incorporated and/or unlawfully owned, controlled, and operated by unlicensed laypersons; (ii) Elmhurst Medical, VLI Medical, Kinetic Approach, and Pitkin Pharmacy submitted claims for Fraudulent Services and Fraudulent Pharmaceuticals, respectively, that were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) Elmhurst Medical, VLI Medical, and Kinetic Approach submitted claims for Fraudulent Services using billing codes that misrepresented and exaggerated the level and nature of services that

purportedly were provided, and Pitkin Pharmacy intentionally targeted a specific set of pharmaceutical products in place of other effective, less costly pharmaceuticals, all in order to inflate the charges submitted to GEICO; (iv) Elmhurst Medical, VLI Medical, Kinetic Approach, and Pitkin Pharmacy engaged in illegal kickback, referral and fee-splitting arrangements with unlicensed individuals and entities as part of a scheme to defraud New York automobile insurers; and (v) in many cases, the Fraudulent Services by Elmhurst Medical, VLI Medical and Kinetic Approach were provided – to the extent they were provided at all – by independent contractors rather than by the entities or their employees. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" through "6".

493.    The Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in Coburn, Ivanov, Nasef, Rubinov, Pinkhasov, and John Doe Defendants operated the Enterprise, insofar as the Provider Defendants never operated as legitimate medical practices and engaged in illegal kickback arrangements to generate patients and/or steer prescriptions to the Provider Defendants and/or Pitkin Pharmacy, making the Provider Defendants and Pitkin Pharmacy ineligible to bill for or collect No-Fault Benefits.  The acts of mail fraud therefore were essential in order for the Defendants to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Provider Defendants and Pitkin Pharmacy to the present day.

494.    The Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These

inherently unlawful acts are taken by the Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

495.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1.2 million pursuant to the fraudulent bills submitted through the Enterprise.

496.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
**Against Coburn, Ivanov, Nasef, Rubinov, Pinkhasov,
and the John Doe Defendants
(Violation of RICO, 18 U.S.C. § 1962(d))**

497.     GEICO incorporates, as though fully set forth herein at length, each and every allegation in this Complaint contained in the paragraphs set forth above.

498.     The Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

499.     Coburn, Ivanov, Nasef, Rubinov, Pinkhasov, and John Doe Defendants are employed by and/or associated with the Enterprise.

500.     Coburn, Ivanov, Nasef, Rubinov, Pinkhasov, and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Enterprise was not eligible to receive under the No-Fault Laws because: (i)  Elmhurst Medical, VLI Medical, and Kinetic Approach were fraudulently incorporated and/or unlawfully owned, controlled, and operated by unlicensed laypersons; (ii) Elmhurst Medical, VLI Medical, Kinetic Approach, and

Pitkin Pharmacy submitted claims for Fraudulent Services and Fraudulent Pharmaceuticals, respectively, that were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) Elmhurst Medical, VLI Medical, and Kinetic Approach submitted claims for Fraudulent Services using billing codes that misrepresented and exaggerated the level and nature of services that purportedly were provided, and Pitkin Pharmacy intentionally targeted a specific set of pharmaceutical products in place of other effective, less costly pharmaceuticals, all in order to inflate the charges submitted to GEICO; (iv) Elmhurst Medical, VLI Medical, Kinetic Approach, and Pitkin Pharmacy engaged in illegal kickback, referral and fee-splitting arrangements with unlicensed individuals and entities as part of a scheme to defraud New York automobile insurers; and (v) in many cases, the Fraudulent Services by Elmhurst Medical, VLI Medical, and Kinetic Approach were provided – to the extent they were provided at all – by independent contractors rather than by the entities or their employees. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" through "6".

501. Coburn, Ivanov, Nasef, Rubinov, Pinkhasov, and John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

502. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1.2 million pursuant to the fraudulent bills submitted by Defendants through the Enterprise.

503.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

504.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company, demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Cause of Action against Coburn, Elmhurst Medical, Ivanov, VLI Medical, Kinetic Approach, and Pitkin Pharmacy, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants and Pitkin Pharmacy have no right to receive payment for any pending bills for the Fraudulent Services and Fraudulent Pharmaceuticals submitted to GEICO;

B.    On the Second Cause of Action against Kinetic Approach, Nasef, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $674,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

C.    On the Third Cause of Action against Kinetic Approach, Nasef, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $674,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

D.    On the Fourth Cause of Action against Nasef, Pinhasov, and John Doe Defendants compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$674,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

       E.       On the Fifth Cause of Action against Nasef, Pinhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $674,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

       F.       On the Sixth Cause of Action against Coburn, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $81,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

       G.       On the Seventh Cause of Action against Coburn, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $81,000.00 together such with costs, interest and such other and further relief as the Court deems just and proper;

       H.       On the Eighth Cause of Action against Elmhurst Medical, Coburn, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $143,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

       I.       On the Ninth Cause of Action against Elmhurst Medical, Coburn, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $143,000.00 together with costs, interest and such other and further relief as the Court deems just and proper;

J.      On the Tenth Cause of Action against Coburn, Pinhasov, and John Doe Defendants compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $143,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Coburn, Pinhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $143,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Ivanov, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $79,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

M.      On the Thirteenth Cause of Action against Ivanov, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $79,000.00 together with costs, interest, and such other and further relief as the Court deems just and proper;

N.      On the Fourteenth Cause of Action against VLI Medical, Ivanov, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $97,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

O.      On the Fifteenth Cause of Action against VLI Medical, Ivanov, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined

at trial but in excess of $97,000.00 together with costs, interest, and such other and further relief as the Court deems just and proper;

  P.  On the Sixteenth Cause of Action against Ivanov, Pinhasov, and John Doe Defendants compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $97,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  Q.  On the Seventeenth Cause of Action against Ivanov, Pinhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $97,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  R.  On the Eighteenth Cause of Action against Pitkin Pharmacy, Rubinov, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $170,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

  S.  On the Nineteenth Cause of Action against Pitkin Pharmacy, Rubinov, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $170,000.00 together with costs, interest, and such other and further relief as the Court deems just and proper.

  T.  On the Twentieth Cause of Action against Rubinov, Pinhasov, and John Doe Defendants compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $170,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against Rubinov, Pinhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $170,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Coburn, Ivanov, Nasef, Rubinov, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1.2 million, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

W.      On the Twenty-Third Cause of Action against Coburn, Ivanov, Nasef, Rubinov, Pinkhasov, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1.2 million, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d) plus interest.

Dated: July 16, 2024

RIVKIN RADLER LLP

By: /s/ Michael A. Sirignano
        Barry I. Levy, Esq.
        Michael Sirignano, Esq.
        Alexandra Wolff, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*